## MEINTS v. HUNTINGTON et al.

(Circuit Court of Appeals, Eighth Circuit. September 3, 1921.)

### No. 5727.

1. **False imprisonment ⬅⟶15(1)—Joint liability not dependent on conspiracy.**

   All persons knowingly joining in a party which falsely imprisoned another are liable jointly and severally, regardless of the extent of their personal participation or of whether or not there was a prior conspiracy.

2. **False imprisonment ⬅⟶5—Forcible removal from state held actionable.**

   Defendants, who, with others, to the number of 75 or more, went to a house where plaintiff was and by a show of force compelled him to go with them, taking him in an automobile across the line into another state and ordering him not to return to the county in which he had resided for many years, *held* chargeable with false imprisonment.

3. **False imprisonment ⬅⟶5—Extrajudicial restraint constitutes "false imprisonment."**

   Prima facie any restraint put by fear or force on the actions of another is unlawful and constitutes a "false imprisonment" for which damages are recoverable, and it is not necessary to allege or prove malice or want of probable cause where the detention is extrajudicial.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, False Imprisonment.]

4. **False imprisonment ⬅⟶10—Consent no defense.**

   In an action for false imprisonment, it is not a defense that plaintiff consented to what was clearly an unlawful restraint of his liberty.

⬅⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. False imprisonment ⊚⇒15 (1)—Persons chargeable liable for acts of others in execution of common purpose.**

Where defendants and others unlawfully seized plaintiff and forcibly carried him to the state line, where he was delivered to masked men, who assaulted, beat, and otherwise maltreated him, defendants *held* liable for the acts of such masked men committed in the execution of a common purpose.

**6. False imprisonment ⊚⇒10—Intent to prevent similar wrong by others no defense.**

In an action for false imprisonment and the assaulting and beating of plaintiff, it is not a defense that defendants' unlawful acts were committed to protect plaintiff from similar action by others which might have resulted in his greater injury or death.

**7. False imprisonment ⊚⇒25—Evidence of reputation of parties held incompetent.**

In an action for false imprisonment and assault and battery, the admission, over objection, of evidence that plaintiff had the reputation of being disloyal during the war, that he refused to buy Liberty Bonds to the amount others thought he should, and that defendants had a reputation for loyalty and good character, *held* error.

In Error to the District Court of the United States for the District of Minnesota; Wilbur F. Booth, Judge.

Action at law by John Meints against O. P. Huntington and others. Judgment for defendants, and plaintiff brings error. Reversed.

Arthur Le Sueur, of St. Paul, Minn. (Tom Davis, of Marshall, Minn., and Earnest A. Michel, of Minneapolis, Minn., on the brief), for plaintiff in error.

Charles Bunn, of St. Paul, Minn. (E. H. Canfield, of Luverne, Minn., and Butler, Mitchell & Doherty, of St. Paul, Minn., on the brief), for defendants in error.

Before CARLAND, Circuit Judge, and LEWIS and COTTERAL, District Judges.

LEWIS, District Judge. John Meints, a resident and citizen of South Dakota, brought this action against O. P. Huntington and others, residents and citizens of Rock County, Minnesota, to recover damages, on the charge that they deported him from Minnesota to South Dakota on the night of August 19, 1918, and maltreated him on the way. After a lengthy trial, exhibited here by 1100 pages of testimony, the greater part of which relates to the loyalty of the defendants and the disloyalty of plaintiff during the late World War, there was verdict and judgment for defendants.

The plaintiff was born in Illinois, went to Rock County, Minnesota, and resided there in the town of Luverne for sixteen or seventeen years prior to the summer of 1918. In the spring of that year he was suspected of being interested in or of having contributed to the support of a Non-Partisan League newspaper printed and published in that town; on account of that, and also because it was claimed that he was disloyal, a large body of men, including some of the defendants, went to his house about midnight of June 19th, woke him up, compelled him to dress and come out, and some of them in automobiles

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

took him across the State line into Iowa, a distance of about fifteen miles, told him not to return and left him there. He then went to St. Paul and reported the occurrence to a U. S. Government agent in the Department of Justice. That agent sent two men to Rock County to make an investigation, and on their report, Mr. Campbell of that Department advised plaintiff to return to Rock County but to go to the home of his two sons, some twelve miles out from Luverne, and remain there. He did return the latter part of July and went to his sons' home. On the night of August 3rd, men in eight or nine automobiles went out to the sons' house. Among them were the defendants Huntington, Connell, Ihlan, Miner, Turnbull and Kimmerling. They tried to enter the house by unlocking the doors with keys which they had, but were not able to do so, and finally obtained entrance by going through the cellar. They were hunting for plaintiff, but could not find him. In the late afternoon of August 19th some seventy-five to eighty men in about twenty-five automobiles, most of them from Luverne, met at a church about four miles from the sons' house, and proceeded from there in a body, arriving at the sons' house about dusk. The plaintiff and his sons saw them coming, went into the house and fastened the screen door on the inner side. The married son's wife and children were also in the house and shortly became greatly excited and alarmed, as their outcries demonstrated. Huntington and others went to the door and demanded to know where the plaintiff was, and that they be permitted to enter. The son who stood inside the door refused to open it and declined to admit them. The defendant Long at once forced the door open and a number of men immediately entered, including Long and Huntington. The son testified that he was assaulted by them and thrown out of the house. They denied that, and testified that his bloody face was caused by his own struggles while they held him to prevent violence on his part. The plaintiff stood at the head of the stairway with a gun and a fork handle. At first he refused to come down or to permit anyone to come up. The other son was induced by some of the defendants, or others with them, to go up and tell his father that they did not intend violence. The plaintiff sent back word by his son that the defendant Long might come up and he would talk with him. He then came down with Long and was taken in Huntington's automobile to Luverne. Huntington drove, and some of the other defendants were in the car with him and the plaintiff. Most of the crowd went with them, but a few turned west toward the South Dakota line before Luverne was reached. Plaintiff was held at Luverne until about eleven o'clock, and while there was refused permission to see his wife or to talk with her over the telephone. About that hour he was again put in Huntington's car. Defendants Huntington, Long, Michaelson and Smith also got in, and they started for the South Dakota line, some fifteen miles away, accompanied by another auto in which were defendants Turnbull, Connell, Kimmerling and McDermott. They reached the State line about midnight, and were stopped there by armed men whose faces were masked. They took Meints from Huntington's car, assaulted him, whipped him, threatened to shoot him, besmeared his body with tar and feathers, and

told him to cross the line into South Dakota, and that if he ever returned to Minnesota he would be hanged.

[1] The complainant alleges a conspiracy on the part of the defendants. The only purpose that such an allegation could serve would be to hold liable those of the defendants not present, if any, who had counseled or advised that the plaintiff should be deported. But there was no proof tending to show that any defendant was not present during some time on the night of August 19th and was joined as a party on the claim that he had advised and counseled the doing of what was done. In other words, plaintiff's case as made consisted of admissions by some of the defendants that they were present and participated, and of proof that others of them, though not all, were also present at times and took part in what was being done. And while the facts as to the meeting at the church, the moving of the seventy-five to eighty men in a body from there to the sons' home, the show there of aggregated power and coercive force, and the taking of the plaintiff from the sons' home, was ample proof to establish a conspiracy by them to do what was done, still the question as to whether there was a conspiracy became wholly immaterial; for as to each participant the law is unconcerned with the extent or degree of his activity when it comes to consider the question of liability, and places all on the same footing, each equally liable jointly and severally, regardless of whether a conspiracy theretofore had been entered into. Cooley on Torts (2d Ed.) p. 145, and cases cited; Howland v. Corn, 232 Fed. 35, 146 C. C. A. 227; James v. Evans, 149 Fed. 136, 80 C. C. A. 240; Van Horn v. Van Horn, 52 N. J. Law, 284, 20 Atl. 485, 10 L. R. A. 184; 12 C. J. 585.

[2, 3] On the foregoing facts, openly admitted by many of the defendants,—and aside from what occurred on the nights of June 19th and August 3rd,—there can be no doubt that from the time the crowd reached the sons' house and on up to the time Meints crossed the State line, he was coerced and compelled by a show of force to submit himself to the will of others, that he was unlawfully restrained of his liberty,—falsely imprisoned for the time being,—and assaulted and abused, and that this was done by those who took part in it in execution of their common purpose to drive him from the State of Minnesota. And so we say at once that the trial court erred in refusing to instruct a verdict for the plaintiff and against all defendants who took part; for it cannot be maintained that because Meints may have been, in their opinion, disloyal, and was interested in and gave support to the Non-Partisan League Newspaper, that that would put him at the mercy of defendants and invest them with the right and power to adjudge and inflict punishment, nor would the fact that the defendants were loyal men, to establish which much evidence was introduced over plaintiff's objection, have the slightest tendency to excuse or justify in the eyes of the law the acts charged against them. Unlawful interference with or injuries to the liberty of a citizen is a violation of his natural, inherent and absolute rights, from which damage results as a legal consequence. Adler v. Fenton, 24 How. 407, 16 L. Ed. 696. Mr. Cooley, in his work on Torts, says:

"False imprisonment is a wrong akin to the wrongs of assault and battery, and consists in imposing, by force or threats, an unlawful restraint upon a man's freedom of locomotion. Prima facie any restraint put by fear or force upon the actions of another is unlawful and constitutes a false imprisonment, unless a showing of justification makes it a true or legal imprisonment."

See Floyd v. State, 12 Ark. 43, 54 Am. Dec. 250.

It was an indictable offense at common law, 3 Blackstone, Com. 127, 4 Blackstone, Com. 218, and relief by the party aggrieved was obtained by an action in trespass vi et armis. The law implies force. 1 Chitty on Pleadings, 186; Rich v. McInerny, 103 Ala. 345, 15 South. 663, 49 Am. St. Rep. 32. Nor is it necessary to allege or prove malice or want of probable cause where the detention is extrajudicial, Colter v. Lower, 35 Ind. 285, 9 Am. Rep. 735; Nixon v. Reeves, 65 Minn. 159, 67 N. W. 989, 33 L. R. A. 506; Akin v. Newell, 32 Ark. 605; Boeger v. Langenberg, 97 Mo. 390, 11 S. W. 223, 10 Am. St. Rep. 322, though in trespass on the case for malicious prosecution these elements, essential to recovery, must be alleged and proven. Barnes v. Viall (C. C.) 6 Fed. 661, where the difference is pointed out. We think the court erred in its refusal to so instruct the jury.

The court yielded to the contention of the defendants that the plaintiff could not recover for anything that was done prior to the assaults made upon him, when the State line was reached, on the claim that he had consented to everything that had happened before that, and so instructed the jury over the objection of the plaintiff. This was prejudicial error. Can it be seriously thought that it was the wish of plaintiff to leave Rock County? His home was in Luverne, his wife was there, he had lived there for many years, all of his family and all of his interests were in Rock County; he had, to the knowledge of some, if not all, of the defendants but recently returned to remain there. He evidently knew the purpose of these men when he saw them coming, some of them had been hunting for him in the night-time a few days before. He armed himself to resist them, but they came in such numbers and invaded the home in such a ruthless and high-handed manner that resistance was obviously futile. He knew, and every rational thought convinces, that if he had not submitted he would have been more severely treated. Who would have the temerity to argue that they would have permitted him to remain, or after starting, to have alighted from Huntington's auto and return? While they held him for two or three hours in Luverne he was refused permission to see his wife or to talk with her over the 'phone. He was in a large room with a crowd about him who jeered him and asked him questions so thickly that there was no opportunity to attempt to answer, and an attempt, if it had been made, would have been without avail. No argument can blot out the fact, which stands predominant throughout the record, that he was a prisoner from the time these men reached his sons' house until he passed over the State line into South Dakota, and everyone who reads the record must know that resistance on his part to their will would not have been tolerated. In Comer v. Knowles, 17 Kan. 436, it is said:

"False imprisonment is necessarily a wrongful interference with the personal liberty of an individual. The wrong may be committed by words alone, or by acts alone, or by both, and by merely operating on the will of the individual, or by personal violence, or by both. It is not necessary that the individual be confined within a prison, or within walls; or that he be assaulted, or even touched. It is not necessary that there should be any injury done to the individual's person, or to his character, or reputation. Nor is it necessary that the wrongful act be committed with malice, or ill will, or even with the slightest wrongful intention. Nor is it necessary that the act be under color of any legal or judicial proceeding. All that is necessary is, that the individual be restrained of his liberty without any sufficient legal cause therefor, and by words or acts which he fears to disregard."

In Pike v. Hanson, 9 N. H. 491, the plaintiff did not intend to pay a tax, and the collector was so informed. He, in demanding the tax, declared to the plaintiff that he arrested her, and she paid the money under that restraint. It was held that the facts were sufficient to sustain her action for assault and false imprisonment. The court summarized the doctrine announced by Starkie on Evidence, thus:

"That in ordinary practice words are sufficient to constitute an imprisonment, if they impose a restraint upon the person and the plaintiff is accordingly restrained, for he is not obliged to incur risk of personal violence and insult by resisting until actual violence be used."

See Hawk v. Ridgway, 33 Ill. 473; Hebrew v. Pulis, 73 N. J. Law, 621, 64 Atl. 121, 7 L. R. A. (N. S.) 580, 118 Am. St. Rep. 716; McAleer v. Good, 216 Pa. 473, 65 Atl. 934, 10 L. R. A. (N. S.) 303, 116 Am. St. Rep. 782; Garnier v. Squires, 62 Kan. 321, 62 Pac. 1005.

In no event could the court determine the fact.

[4] Furthermore, we are of opinion that the law does not permit the citizen to consent to unlawful restraint, nor such a claim to be made upon the part of the defendants. It is so held as to assault and battery, Cooley on Torts (2d Ed.) 188, which is a part of the charge in the complaint, and we think the principle equally applicable to restraint, which includes an assault. In Wharton on Criminal Law, vol. 1, § 751e, it is said:

"No man has a right to take away another's liberty, even though with consent, except by process of law. And the reason is, that liberty is an unalienable prerogative of which no man can divest himself, and of which any divestiture is null."

See, also, Bell v. Hensley, 48 N. C. 131; Shay v. Thompson, 59 Wis. 540, 18 N. W. 473, 48 Am. Rep. 538; Adams v. Waggoner, 33 Ind. 531, 5 Am. Rep. 230; Barholt v. Wright, 45 Ohio St. 141, 12 N. E. 185; Jones v. Gale, 22 Mo. App. 637.

[5] The court, acting on its conclusion of fact that plaintiff had consented to everything before the State line was reached, instructed the jury over plaintiff's objection and exception that he could recover only against those who maltreated him at the South Dakota line, and that if the evidence was not sufficient in the judgment of the jury to satisfy them as to the identity of those men they would return a verdict for the defendants, there being no liability on the part of any of the defendants except those, if any, who assaulted him there. This we think was also error. As already said, those who took the

plaintiff from the sons' home, those who participated to any extent in so doing, those who aided in his deportation on the way, and those who abused him at the State line and warned him that if he ever returned to Minnesota he would be hanged, were all actively engaged in the execution of one purpose, and the transaction throughout, from its inception to the end, was for the accomplishment of that purpose. Moreover, those who took him to the State line perpetrated an unlawful act in violation of plaintiff's rights in doing so, and thus directly aided and assisted in bringing about the injuries that were there inflicted upon him.

[6] It is also claimed by the defendants that what was done by them was done to protect the plaintiff against others who might injure him because of his disloyalty, or his reputation for disloyalty. This presents a new doctrine unknown to us, and no authority has been cited to support it. We cannot believe that the law will ever sanction the claim, either in defense or mitigation, that the rights of one may be violated for the purpose of preventing others from doing the same thing.

[7] The defendants were allowed over objection to show that on occasions the plaintiff did not contribute to funds being voluntarily raised in aid of war activities when others thought he should contribute; or did not give as much as others thought he should give; or perhaps did not buy as many bonds issued to maintain and carry on the war as others thought he should buy; that he had contributed fifty dollars to establish the Non-Partisan League newspaper, and that because of this he was required to relinquish his right to continue work on county roads under a contract which he then held; to inquire on cross-examination of some of plaintiff's witnesses as to the loyalty of the witness; to ask the witness if some of the defendants had not been elected to important offices and if the witness had not voted for them, and if he did not know that the defendants were good men and loyal men; to ask defendants and other witnesses about the sentiment against plaintiff in the community and about rumors; to prove conversations about plaintiff between some of the defendants and third parties; to show what was said at political or other public meetings; to show what was said at a meeting in which some of the defendants participated, held to determine what should be done with the Non-Partisan League paper, the premises at which it was printed being thereafter forcibly closed and nailed up; and to permit a deputy sheriff to testify that he told defendant Huntington that Floyd Weatherly had told him that he heard plaintiff and one of his sons say that they were arming themselves. Weatherly testified that he did not hear the plaintiff or his son say that, and that he made no such statement to the deputy sheriff. Much of this was clearly hearsay. That which related to the reputation or character of the litigants was incompetent, because it is the general rule that such evidence is not admissible in civil actions, unless character or reputation is put in issue by the very proceeding itself. 1 Greenleaf on Evidence, §§ 54, 55, 2 Greenleaf on Evidence, § 269; Givens v. Bradley, 3 Bibb (Ky.) 192, 6 Am. Dec. 646; Beal v. Robeson, 30 N. C. 276; Smith v. Hyndman, 10 Cush.

(Mass.) 554. It has been observed that actual malice is not an element of the cause of action, and need neither be alleged nor proved; and there was no claim made by the plaintiff, and no attempt by him to prove, that the defendants were actuated by personal ill will or hatred toward him, other than as it might be found to exist in their acts. Shanley v. Wells, 71 Ill. 78, was an action of trespass for assault and battery and false imprisonment. The plaintiff had judgment. It is said:

"It is also urged, with some apparent earnestness, that a new trial should be awarded, because the evidence does not show that the defendant acted from malice, and without any reasonable or probable cause. This is sufficiently answered by reference to the form of the action. The suit is not for malicious prosecution, but for assault and battery, and false imprisonment. If the plaintiff was assaulted and beaten, or imprisoned, by the defendant, without authority of law, it cannot be doubted that he is entitled to recover, whatever may have been the defendant's motives. * * * The defense of justification not being proved, the defendant's act stands as a wanton violation of the plaintiff's rights—an inexcusable trespass, for which the plaintiff is entitled to damages."

We are of opinon that evidence of the character above-noted should not have been admitted, because it had no tendency to disprove a reckless and wanton indifference to plaintiff's rights, and a deliberate intention to violate those rights; nor did it tend to lessen, modify or ameliorate the effect of those acts, or the intention with which they were done. This conclusion seems to be unavoidable in view of the fact that the acts complained of and established by the undisputed evidence were not done for the purpose of bringing the plaintiff to trial on account of his having committed a criminal offense, or because it was believed on reliable information that he had done so, Beckwith v. Bean, 98 U. S. 266, 25 L. Ed. 124, but those acts were wilfully done to accomplish the unlawful purpose of denying to plaintiff his right to remain in and reside in the place of his choice. The rule applicable to a case of this character was announced by Judge Thayer in Fotheringham v. Adams Express Co. (C. C.) 36 Fed. 252, 1 L. R. A. 474. After noting the claim of the Express Company that the false imprisonment was without malice, he proceeded on that assumption to say:

"With reference to this contention it is only necessary to say that the right of the jury to assess punitive damages in this class of cases does not necessarily depend upon the existence of malice, using that term in its ordinary sense. Punitive damages may be awarded when a wrongful act is done wilfully, in a wanton or oppressive manner, or even when it is done recklessly, —that is to say, in open disregard of one's civil obligations and of the rights of others. The cases on the subject show that in the manner of assessing damages for a false imprisonment, or for an assault or trespass, it is the duty of the jury to consider not only all the circumstances of aggravation attending the wrongful act, but in some measure, at least, the nature of the right that has been invaded, and the effect upon social order of permitting a wrongdoer to escape without substantial punishment, in case of a flagrant violation of the law and the rights of others. Huckle v. Money, 2 Wils. 205; Beardmore v. Carrington, Id. 244; Merest v. Harvey, 5 Taunt. 442; Conrad v. Insurance Co., 6 Pet. 268; Day v. Woodworth, 13 How. 363; Voltz v. Blackmar, 64 N. Y. 440; Drohn v. Brewer, 77 Ill. 280; Sherman v. Dutch, 16 Ill. 283; McBride v. McLaughlin, 5 Watts, 375; Turnpike Co. v. Boone, 45 Md. 344; McWilliams v. Bragg, 3 Wis. 424; Green v. Craig, 47 Mo. 90. I have no doubt that it was

within the discretion of the jury in the present case to assess substantial damages as a punishment of the wrong-doer, and to deter others from committing like offenses."

See also Cowen v. Winters, 96 Fed. 929, 37 C. C. A. 628.

The judgment is reversed and the cause remanded for a new trial.

COTTERAL, District Judge, concurs in the result.