**Ralph MARTINEZ, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 18901.**

United States Court of Appeals Ninth Circuit.

June 22, 1964.

Malcolm J. Rainsford, Rainsford & Rainsford, San Francisco, Cal., for appellant.

Cecil F. Poole, U. S. Atty., and Jerrold M. Ladar, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before KOELSCH, Circuit Judge, MADDEN, Judge of the Court of Claims, and DUNIWAY, Circuit Judge.

MADDEN, Judge:

The defendant, Ralph Martinez, has appealed from the judgment of the United States District Court convicting him of fraudulently concealing a narcotic drug, in violation of Section 174 of Title 21 of the United States Code. His appeal is based upon a single contention: that the package of heroin found in the air ventilator of his automobile and admitted in evidence at his trial should not have been admitted in evidence because, he says, the heroin was obtained by the narcotics agents of the United States by an unconstitutional search of his automobile. The Government says that although the search of the automobile was made without a search warrant, and was not made in connection with an arrest, it was nevertheless not an unconstitutional search because Martinez gave his consent to the search. Martinez says that he was coerced into such consent as he may have given by events immediately preceding the alleged consent. Those events will now be recited.

Federal Narcotics Agent Habib had, on September 30, 1962, made a $1,000 purchase of marijuana from one Perry Jackson. Jackson at that transaction told Habib that he obtained drugs from "down south" accompanied by a Mexican

boy who drove Jackson back and forth. On October 4, 1962, Habib made a $500 purchase of marijuana from Jackson. At this transaction Jackson told Habib that he was going to Mexico to get $9000 worth of heroin and that the same Mexican boy would accompany him. On October 10, 1962, Habib made a purchase of heroin from Jackson. Jackson told Habib that the heroin had been brought into the United States in the air ventilator of the automobile which was transporting him. Jackson was arrested immediately after this sale.[1]

On the night of Jackson's arrest, narcotics agents found a receipt for bail and a traffic ticket in Jackson's possession. The bail receipt led to the discovery that Jackson and one Ralph Martinez had spent time in jail together in San Diego. The automobile license number on the traffic ticket was Ralph Martinez' license number. The agents went to the address of Ralph Martinez which the Department of Motor Vehicles had on file. He no longer lived there. His mother, who was there, told the agents that he and his wife had moved to 600 Fell Street, in San Francisco. The agents went to that address and waited for him.

Martinez, with his wife, drove up to the front of 600 Fell Street, which was an apartment building, parked the automobile and entered the building. As they entered, the agents identified themselves to Martinez and said they wanted to talk to him. He started to walk away from them. One of the agents placed his hand on Martinez' shoulder and said, "We are federal agents and we want to talk to you." Thereupon Martinez went with them into the foyer of the apartment house. One of the agents frisked, or patted, Martinez to see if he was armed. Martinez' wife became excited and one of the agents suggested that they continue their conversation somewhere other than in the common hallway where other people were passing. They then went to the elevator and rode to the fifth floor and walked to the Martinez apartment, where either Martinez or his wife opened the door, and they entered. A Mr. Van Raam, an agent of the State of California, who was cooperating with the federal agents, sat and talked with Martinez. Another agent asked Martinez if he might look around the apartment. Martinez said that he could. That agent and another one made a thorough search but found nothing relevant. Van Raam told Martinez that Jackson had been arrested. Martinez said he had heard that on his automobile radio. Van Raam questioned Martinez, basing his questions on the information Habib had obtained from Jackson and what the agents had learned from other sources. Martinez at first denied and then, when it was apparent that Van Raam had reliable information, admitted his trips to Mexico with Jackson. Van Raam asked Martinez if he had any narcotics in his automobile. Martinez said he did not. Van Raam asked if he would mind if the agents looked in the car. Marinez said, "No. Go right ahead."

Van Raam searched the automobile and, no doubt because of what Jackson had told Habib, he searched in the air ventilator and found the package of heroin, the search for and discovery of which is the subject of this appeal. After the discovery of the heroin, Martinez was immediately arrested and was, as we have seen, in due course tried and convicted, the seized heroin being admitted in evidence at the trial.

As we said at the outset, Martinez' appeal is based solely upon the claim that the search of his automobile, in the light of the events which had immediately preceded it, was unconstitutional. The Government, as we have seen, justifies the legality of the search solely upon the ground that Martinez consented to the search.

The question before us was twice raised and carefully considered in the District Court. On March 1, 1963, Martinez filed a Motion to Suppress Evidence and a Petition in Support Thereof,

---

1. Jackson was separately charged, pleaded guilty and was sentenced to imprisonment.

Hearings on the motion were held on March 8 and March 12. The motion was denied on March 12. These proceedings in March were before Chief United States District Judge George B. Harris. Objection was made at the trial on June 3, 1963, to the introduction of the narcotics in evidence, Judge Oliver Carter in his ruling on the objection taking into consideration the evidence which had been introduced at the hearing in March on the Motion to Suppress. He overruled the objection.

Our question is whether the consent given by Martinez for the search of his automobile was a voluntary consent which made lawful the search which followed. In other contexts the word voluntary might connote anything from enthusiastic action taken on one's own initiative, at one extreme, to grudging action just short of being compelled by what the law would regard as duress, at the other. An innocent person who was told that he was suspected of having evidence of a crime in his house or his automobile might invite or urge a search in order to remove the suspicion. But the cases in which the question of consent to a search is litigated are cases in which the search, whether lawful or not, has produced evidence of guilt which the defendant seeks to have excluded at his trial. It is quite unthinkable that a person in that situation would really welcome any contact with the police. District Judge Weinfeld apparently thought so when, in resolving a question of credibility as between the defendant and the police, he wrote: [2]

> * * * the alleged consent under the facts and circumstances here presented—a defendant at once denying that narcotics are in his room and at the same time agreeing to a search which obviously must yield narcotics—is not in accord with common experience.

In the instant case we have no open question of credibility. The question of what was said and done at and before the giving of the verbal consent was fully tried, on the motion to suppress, and was reconsidered at the main trial, when the admission of the discovered heroin in evidence was objected to. We would have no justifiable reason not to accept the conclusions of two district judges as to these events. United States v. Page, 9 Cir., 302 F.2d 81, 85. The defendant relies upon Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. But in Wong Sun there was a finding, accepted by the Supreme Court, that there had been an illegal arrest, following an illegal breaking and entering, and the Court applied the "fruits of the poisonous tree" doctrine. Here there was neither an arrest nor a breaking and entering. The trier of fact could reasonably conclude from the record that the entry was with Martinez' voluntary permission.

While it may not be "in accord with common experience" [3] for a guilty person to consent to a search which, if successful, may help to prove his guilt, it may nevertheless occur. Happily, not all criminals are highly intelligent and use the most effective tactics in their contacts with the police. Again happily, sometimes their contacts with the police confuse them, and they say and do things which, after deliberation, they regret. To whatever extent stupidity or confusion on the part of the guilty person contributes to the prompt acquisition by the police of evidence of crime, so that the police can get back to work on the numerous cases which may remain unsolved, society is the gainer and nobody is the loser of anything to which he is constitutionally entitled. Furthermore, even a bright criminal, being aware that a refusal to let the police "look around" may leave him under suspicion, and thinking that he has concealed what the police are looking for so effectively that they will not find it, may deliberately consent to a search to allay suspicion. In our instant case Martinez may well

2. United States v. Gregory, 204 F.Supp. 884, 885 (D.C.S.D.N.Y.1962).

3. Judge Weinfeld, supra, note 2.

have thought that the concealment of the heroin in the air ventilator at least made its discovery difficult. Since the search of his apartment had produced nothing, he might have expected that the search of his automobile would be routine, not thorough. It might, in fact, have been so had not Martinez' confederate Jackson told the federal agent Habib how cleverly he was cheating the law, thus assuring Habib that he could count upon a dependable supply of illegally imported narcotics.

The question whether a guilty person may under any circumstances give a valid consent to a search has been recently and thoughtfully considered and decided by this court. In the case of United States v. Page, 302 F.2d 81, cited supra, this court, sitting *en banc*, unanimously held that a search without a warrant, but consented to by the person whose premises were to be searched, could be valid if it was voluntary. It held that the question, in each case, as to whether the consent was voluntary, is one of fact, to be determined by the trial court and to be reversed on appeal only if the trial court's determination is clearly erroneous. This court there reversed an order suppressing evidence because, instead of exercising its fact-finding function, the trial court had ruled that, as a matter of law, the consent involved could not be voluntary. This court directed the trial court to find the facts. In the instant case, the trial court has found the facts, and its finding that the consent was voluntary is not clearly erroneous.

The judgment is affirmed.

KOELSCH, Circuit Judge (dissenting).

Consent, meaning of course a genuine consent is not reflected by this record. To the contrary, coercion is clearly indicated. I thoroughly agree with the statement of my associates that "in the instant case we have no open question of credibility" and I readily accept as true the version of the incident given by the narcotics agents. However, while it is the province of a trial judge in matters of this kind to observe the witnesses, to appraise their credibility and to resolve conflicts in their testimony, I do not understand that the factual conclusions he draws from the primary facts are necessarily binding upon this court. And here I view such conclusions as clearly erroneous and would reverse the judgment.

I am willing to assume that Martinez was stayed by a gentle hand when he sought to walk away from the agents, and I grant that none of the three enforcement agents afterward used further physical force. And perhaps technically the agents did not "arrest" Martinez until after they discovered the heroin concealed in his automobile, for until then they plainly had no intention to charge him with the commission of a crime. (A.L.I. Restatement Torts § 112).

But it is clearly apparent that they detained and had him under their dominion from and after the initial encounter for one of the agents, when questioned concerning their intention regarding Martinez, candidly testified "Maybe we let him go depending on what we found in the car. Maybe we take him down for questioning." Such detention, depriving Martinez as it did of his personal liberty, constituted a false imprisonment which was an indictable offense at common law. Meints v. Huntington, 276 F. 245 (8th Cir. 1921).

Under such circumstances, it would appear highly unlikely that the consent given by Martinez was unrelated to the agents' highhanded behavior and was the product of his free will; a more logical conclusion, in my estimation, is that Martinez, wanting the agents to let him go and hoping they would not find the cache, took a chance in an attempt to regain his liberty.