UNITED STATES of America, Appellee,

v.

Robert Dale HART, Appellant.

UNITED STATES of America, Appellee,

v.

Ruben Morales ROBLES, Appellant.

Nos. 74–3001, 74–3270.

United States Court of Appeals,
Ninth Circuit.

July 22, 1976.

Rehearing and Rehearing En Banc
Denied Aug. 19, 1976.

Certiorari Denied Feb. 22, 1977.
See 97 S.Ct. 1155.

Louis L. Deckter (argued), Tucson, Ariz.,
for appellant in 74–3001.

Michael J. Brown (argued), Tucson, Ariz.,
for appellant in 74–3270.

William C. Smitherman (argued), U. S.
Atty., James E. Mueller (argued), Asst. U.
S. Atty., Tucson, Ariz., for appellee.

Before  CHAMBERS, KOELSCH,
BROWNING, DUNIWAY, ELY, HUF-
STEDLER, WRIGHT, TRASK, CHOY,
GOODWIN, WALLACE, SNEED, and
KENNEDY, Circuit Judges.

TRASK, Circuit Judge:

Hart and Robles appeal their convictions for distributing cocaine in violation of 21 U.S.C. § 841(a)(1). The appellants, who were tried separately, sold cocaine to government agents pursuant to arrangements made by paid informants. Their only defense was entrapment.

The appeal presents two questions: (1) Did the district court err in denying the appellants' respective motions to continue for failure of the government to produce the informant Murrieta, who was the key figure in the sale and upon whom the appellants depended to prove their entrapment defenses? (2) Did the district court err in foreclosing Robles from raising the entrapment defense because he refused to take the stand and there to admit the offense?

## I.

The court took this case en banc to determine whether the government was a "guarantor" of the presence of an informant at the trial of a case in which he had been used. We hold that it is not, and adhere to the rule that the government must use reasonable efforts to produce a government informant whose presence has been properly requested by the defendant. *United States v. Leon,* 487 F.2d 389 (9th Cir. 1973); *United States v. Jenkins,* 470 F.2d 1061 (9th Cir. 1972); *Tapia-Corona v. United States,* 369 F.2d 366 (9th Cir. 1966); *Velarde-Villarreal v. United States,* 354 F.2d 9 (9th Cir. 1965).

The record discloses the essential facts. The government availed itself of the services of two Mexican nationals in the development of the case against the appellants. Their names were Borjorquez and Murrieta. The arrest and the trial took place in Tucson and the court ordered that the government agent, Lugo, "make effort to locate informants and procure their presence at trial." Borjorquez was produced for interview on July 25 prior to the scheduled August 13 trial of appellant Hart to be followed immediately by the August 14 trial of Robles. He was questioned in the courtroom with the court interpreter assisting,

and with the judge announcing his availability if required. Borjorquez identified both himself and Murrieta as being residents of Magdalena, Sonora, Mexico. He further explained that Murrieta "has a little store, a general merchandise store" where he sells groceries and gave the street intersection where the store was located. He stated that Murrieta did not come for the interview "because he's ill and apparently in pain."

On August 12, a hearing was held on a motion to continue because Murrieta, who by then had developed as the only knowledgeable informer, had not appeared for interview or for trial. Special Agent Charles Lugo of the Drug Enforcement Administration was questioned under oath. He testified that his contact had principally been by telephone conversations initiated by Murrieta or Borjorquez. He stated that he had talked to them at least a dozen times between July 9 and August 12, telling them they would have to be present for the trial. He talked to them at least six times after Borjorquez had appeared for his interview on July 25. At no time did either indicate he would not be present. The last time he conversed with them was on Sunday, August 11, when they called from Santa Ana, Mexico. They assured him then, as they had before, that they would be in Tucson for pretrial interview on the following day, Monday, and for the trial on Tuesday.

At the conclusion of this evidentiary hearing on Monday the trial court denied the motion to continue with leave to renew it on Tuesday if Murrieta still had not appeared. On Tuesday, the day of trial, Murrieta had not arrived and a further hearing was held. Lugo told the court he had received a telephone call from Borjorquez after he returned to his office on Monday following the evidentiary hearing. Lugo related he had told Borjorquez in very strong terms to get Murrieta and come to Tucson at once. He also told them to call him from Nogales, at the border, and that he (Lugo) would pick them up and drive them to Tucson. He had received no further word.

Lugo also amplified his testimony regarding employment of informants by explaining that when they are "first documented as informants" they are advised that the DEA requires that if they participate in a case in any way and are asked to testify they must be present to testify. "That's one of the requirements for informants."[1] He further stated that to his knowledge neither had been in the United States and available to subpoena, since the Borjorquez interview on July 25. On one occasion he had sent $20 to them to come up but they had not done so. The court denied the motion for a continuance and the motion to dismiss as to each defendant.[2]

It was suggested at oral argument that Murrieta could have been "detained" as a material witness when he appeared and testified for the government as an informant in a case in mid-May of the same year that was tried in the United States District Court in Tucson. This is probably correct. *See United States v. Verduzco-Macias*, 463 F.2d 105 (9th Cir. 1972); *Bacon v. United States*, 449 F.2d 933 (9th Cir. 1971). At least some inducement such as retention of a portion of the reward until the case was closed, could have been made. But this case is not akin to *Bacon* or *Verduzco-Macias*. There the putative witnesses were fugitives; they had not only shown a disincli-

nation to cooperate but the Mexican aliens were subject to possible imprisonment should the government have wished to indict and prosecute. Every self-interest was on the side of their fleeing the jurisdiction. Here, Murrieta up to that mid-May (the date of his last physical presence in the United States) had always been cooperative. He had promised to testify in court in May in a narcotics case and had appeared and testified as he had promised. He had not at that time refused to cooperate in any respect so far as the record shows. Neither had he failed to keep any commitment to testify. Had he been taken into custody at that time when there was no apparent reason to distrust him, he might well have been a very unhappy witness to be kept away from his home, his family and his business from mid-May until mid-August. It was also argued that the government might have withheld a portion of his reward. Again, he had presumably been paid before and had still cooperated. Under the Department's requirements to be available to testify he still risked the loss of future rewards if he failed to appear when requested. Was there any reason as a matter of foresight for Lugo to believe that this case was different?

■ The dissent acknowledges that the government must only use reasonable ef-

1. "THE WITNESS: When they were first documented as informants, they were advised that the procedure of the Drug Enforcement Administration, one of them is that if they participate in any way or conduct any introductions and we ask them to come to court, or the defense requests them to come to court to testify on behalf of the Government, that they will be present to testify. That's one of the requirements for informants.

"Q. BY MR. KNAUSS: Is that done as a matter of standard procedure in your agency?
"A. Yes, sir, it is, sir.
"Q. Did you do it yourself personally?
"A. Yes, sir.
"Q. Is this done with both Mr. Borjorquez and Mr. Murrieta?
"A. Yes, sir, I did.
"Q. Did you remind them of that procedure during any of your calls that you have told us about?
"A. Yes, sir. But it was indirectly referring to the other case that they had been up here before on. And I told them, that, well, I know

they didn't like the idea of testifying, but I told them that regardless of whether or not they liked it or not, anytime they did a case and they got paid by the Government for doing it, that they were part of the case and they were required to testify, they would have to testify." R.T. Vol. 4 at 36–37.

2. "It appears to me that the Government has met the burden that they must bear. They've done everything reasonably necessary and proper that they could be required to do lawfully, legally to get these witnesses here. The defendants have a little obligation themselves. They've known who these witnesses are, and have known basically where they are. They were—had an opportunity to interview one of them for three hours or better. I think we've bent over backwards for the defendants in this case and have given them far more latitude than I know of any case that says we must give a defendant under the circumstances." R.T. Vol. 4 at 42.

forts to produce the informant. Part of the difference between the majority rationale and the dissent is the point at which "reasonable effort" is to be judged. We believe it to be as of the time the government is exerting its efforts to obtain the attendance of the witness, taking into consideration the background of performance and attitude of the desired witness as of that time. That would ordinarily be after the trial date had been established and as the case was progressing to the actual finalized trial date. At the time Murrieta was last in the United States as far as the evidence shows, (mid-May before the August 13 trial date) the trial date had not been established finally. Certainly as of that time there was no reason to suspect that future performance would be any less than the 100 percent performance of the past.

After Murrieta had returned to Mexico there was nothing to do but to accept his promises as given with the expectation that he would fulfill them, together with the inducements of expense money and travel assistance. As of now the record is, of course, silent as to whether Murrieta was on his way, met with accident, remained ill or otherwise unable to fulfill his promise or whether he was simply recalcitrant. Just as ex post facto verification of the correctness of a tip from an informer by discovery of the contraband does not justify a finding of probable cause based upon the tip alone, *United States v. Moreno-Buelna,* 524 F.2d 1129, 1133 (9th Cir. 1975), (Hufstedler, J., dissenting), so, too, in this case, the view from perfect hindsight disclosing that an informer did not in fact show up for a trial, does not thereby establish conclusively that there was no reasonable effort made to produce him, or by him to appear.

All of which brings us to the all important consideration of the function of the trial judge at this point and the effect of his determination. His finding was that the government had met its burden. "They've done everything reasonably necessary and proper that they could be required to do lawfully, to get these witnesses here." The trial court had held two evidentiary hearings before making this determination. We hold that the trial court's finding should be sustained unless clearly erroneous and that it was not clearly erroneous under these circumstances.

This court sitting en banc held in *United States v. Page,* 302 F.2d 81 (1962), that the clearly erroneous rule applied in criminal cases by analogy to Rule 52(a), Fed.R. Civ.P., when the trial court rules upon the admissibility of evidence in the face of a motion to suppress. The motion to suppress was based upon the contention that a consent to search had not been validly given. This court decided in *Page* that it was for the trial court to determine, given certain facts, whether consent had been given in form and whether that consent was "valid" else it was no legal consent. In *Robles* and *Hart* the court hears certain facts and must determine whether the government did everything "reasonably necessary" to obey its order to produce an informant. In *Page* we held that the question was one of fact and was governed by the "clearly erroneous" rule. Our view is that the same rule applies here.[3]

In each case the responsibility of the trial court could be argued to involve a mixed question of fact and of law—in the case at bench, "reasonably necessary" versus the case in *Page* "no duress or coercion, express or implied" and "freely and intelligently given."[4] This court in cases subsequent to *Page* had adhered to the rule that questions of fact (even where arguably mixed with law) in criminal matters are governed by

---

**3.** Said this court in *Page* at 83:

"The government must prove that consent was given. It must show that there was no duress or coercion, express or implied. The consent must be 'unequivocal and specific' and 'freely and intelligently given.' There must be convincing evidence that defendant has waived his rights. There must be clear and positive testimony. . . . " (Footnotes omitted.)

**4.** In *Page* the trial court's finding was reversed but because the trial court mistakenly assumed that as a matter of law because of a prior ruling, he was obliged to make the ruling that he did.

the clearly erroneous rule.[5] Other jurisdictions have applied the same test, some without considering the fact that Rule 52(a), Fed.R.Civ.P. only applies directly to civil cases.[6]

Nor can it be convincingly established that the pretrial ruling was a "conclusion of law" and therefore not subject to the clearly erroneous rule. The cases cited in notes 5 and 6, *supra*, which applied the clearly erroneous rule, could all arguably be considered to involve a question of law as well as a finding of fact. In *Lundgren v. Freeman*, 307 F.2d 104 (9th Cir. 1962), we discussed the distinction between findings of fact to which the clearly erroneous rule applied and, borrowing from *Commissioner v. Duberstein*, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), decided that "[a] finding of fact, to which the clearly erroneous rule applies, is a finding based on the 'fact-finding tribunal's experience with the mainsprings of human conduct'." *Lundgren v. Freeman, supra* at 115. In *Velarde-Villarreal v. United States*, 354 F.2d 9, 13 (9th Cir. 1965), the very issue was decided by this court: "We think whether there was a failure to expend every reasonable effort to obtain the witness is a question of fact for the trial judge." Here, the trial court had before him the agent who was responsible for Murrieta's presence at the pretrial and trial proceedings. As a "border court" the judge was familiar with the problems of obtaining Mexican aliens to testify and the means which could be said to be reasonable or lack reasonableness to obtain their testimony. He held two evidentiary hearings to assure himself that reasonable efforts had been made. It was for him to measure the quality of the effort and the sincerity of the officer's words and actions.[7]

Other circuits faced with the same problem have not gone beyond the "reasonable effort" standard.[8] None has been found

5. *E. g., United States v. Trice*, 476 F.2d 89 (9th Cir. 1973) (finding corroboration of informant's testimony sufficient not clearly erroneous); *McKinney v. United States*, 487 F.2d 948 (9th Cir. 1973) (finding that a defendant had not met burden of proof of incompetency to stand trial not clearly erroneous); *Costello v. United States*, 324 F.2d 260 (9th Cir. 1963) (clearly erroneous rule applied in considering whether evidence sustained finding that officers who arrested defendant acted upon probable cause).

6. *E. g., United States v. Jones*, 475 F.2d 723 (5th Cir. 1973) (whether defendant's statement as to where stolen money was hidden was voluntary judged by clearly erroneous test); *United States v. Conner*, 478 F.2d 1320 (7th Cir. 1973) (whether facts disclosed constituted reasonable grounds for arrest without warrant measured by clearly erroneous standard). *See also* 9 *Wright & Miller, Federal Practice and Procedure*, ¶ 2573, at 689 (1971 ed.); *Lewis v. United States*, 382 F.2d 232, 234 (8th Cir. 1967).

7. The dissent states in support of an innuendo of a lack of due process that "Neither is it simple to decide whether the Government *has participated*, by 'suggestion, procurement, or negligence', in the unavailability of a witness, which is a denial of due process (*United States v. Mendez-Rodriguez* (9th Cir. 1971) 450 F.2d 1, 5; *United States v. Tsutagawa* (9th Cir. 1974) 500 F.2d 420), and a failure to use reasonable efforts to produce a government informant whose departure was aided by his reward money, *which only potentially leads to a dismissal of an indictment*." (Emphasis added.) The insinuation that the government has "participated" in the absence of the witnesses is not supported by any evidence in the record and the trial court so found.

8. *United States v. Williams*, 496 F.2d 378, 382 (1st Cir. 1974); *United States v. Super*, 492 F.2d 319, 321 (2d Cir. 1974); *United States v. Jones*, 492 F.2d 239, 242 (3rd Cir. 1974); *United States v. Tatum*, 496 F.2d 1282, 1284 (5th Cir. 1974); *United States v. Pollard*, 483 F.2d 929, 931 (8th Cir. 1973); *United States v. Hayes*, 477 F.2d 868, 871 (10th Cir. 1973); *United States v. Cansler*, 419 F.2d 952, 954 (7th Cir.), *cert. denied*, 397 U.S. 1029, 90 S.Ct. 1278, 25 L.Ed.2d 540 (1970).

This Circuit has followed *Page* a half dozen times and as recently as *United States v. Townsend*, 510 F.2d 1145, 1147 (9th Cir. 1975). Other Ninth Circuit cases are:

*United States v. Chase*, 503 F.2d 571, 572 n. 3 (1974)

*United States v. Agosto*, 502 F.2d 612, 614 (1974)

*United States v. Phelps*, 490 F.2d 644, 646 (1974)

*United States v. Rothman*, 492 F.2d 1260, 1264 (1973)

*United States v. Marshall*, 488 F.2d 1169, 1186 (1973).

*Page* has been followed by the Sixth Circuit, *United States v. Gargotto*, 510 F.2d 409, 411 (1974); by the D.C. Circuit, *Jackson v. United States*, 122 U.S.App.D.C. 324, 353 F.2d 862, 865 n. 4 (1965); and by the Ninth Circuit, *Martinez v. United States*, 333 F.2d 405, 407 (1964).

which has required that the government "guarantee" or "insure" the presence of the witness and we decline to do so here. That this informer lives south of the border does not alter our conclusion. An informer can go underground in New York City, Chicago or Los Angeles and be just as unavailable for pretrial or trial, and the same rules should and do apply. The informants here went back to Mexico because it was where they lived and where Murrieta had his store and Borjorquez earned his small livelihood.[9]

In sum, we are unable to say that the finding of the trial court that the government used reasonable efforts to produce these informants was clearly erroneous. It must be remembered that it was the trial court which heard testimony on direct and cross-examination at two evidentiary hearings; that it was the trial court which observed the demeanor of the witnesses; and most importantly that it was the trial court which considered the options available to the agent at the time he made his decision and measured the reasonableness of the agent's actions against the facts and options available to him at that time.[10] It is not our role as an appellate court to try this case de novo.

The decision of the trial court that the government did exert reasonable efforts to produce the informers, is affirmed, and appellants' motion to continue was thus properly denied.

## II.[11]

■ In requiring Robles to admit the offense as a condition to his asserting entrapment, the district court relied on the Eastman line of cases that we overruled in United States v. Demma, 523 F.2d 981 (9th Cir., en banc, 1975). Demma applies to

Robles whose appeal was pending when Demma came down. None of the doctrines that have been developed to limit the retrospective effect of new rules of law upon pending cases has any application to Demma. That decision announced no new rule of law; it did not represent any "sharp break in the web of the law" (Milton v. Wainwright, 407 U.S. 371, 381 n. 2, 92 S.Ct. 2174, 2180, 33 L.Ed.2d 1 (1972) (Stewart, J., dissenting)). Indeed, Demma mended a break in the law caused by the aberrational Eastman cases and its spawn and reconciled the law of our Circuit with Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); and United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The special retroactivity doctrines affecting the exclusionary rule stated in United States v. Peltier, 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), are irrelevant. Equally remote from the Demma context are those cases that have given limited retrospective application to new prophylactic procedural rules, for example, Halliday v. United States, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969), holding that McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), was not retroactive to guilty pleas taken before McCarthy was decided. The Eastman error is grounds for reversing Robles' conviction.

Upon remand, the defendants and the government will have the opportunity to present the issues in the light of the factual and legal developments that have occurred since these cases were tried.

As to defendant Hart, the judgment of the court below is affirmed. As to defend-

---

**9.** The dissent implies that the payment of the reward financed or "assured them adequate funds" to return to Mexico. There is no evidence to support such a suggestion. A hold out of payment due them would have created an inducement. There is no evidence that it would have accomplished its purpose.

**10.** We note that the options available to the government to pay or not to pay the informants and to detain or not to detain Murrieta were all

made prior to any record of broken promises. There was never any indication that the government participated, by suggestion or by procurement, in the unavailability of the witnesses.

**11.** This portion of the opinion was prepared by Judge Hufstedler for an earlier draft and is used with her permission, having met the approval of a majority of the court.

**804**

ant Robles, the judgment is reversed and remanded for proceedings not inconsistent with this opinion.

DUNIWAY, Circuit Judge (concurring and dissenting):

Like Judge Hufstedler, I concur in Part II of Judge Trask's majority opinion. In all other respects, save one, I join in Judge Hufstedler's dissent. I differ with Judge Hufstedler in her view that the question before us is a question of law. I think that Judge Trask is right in saying that the question is whether the court's finding that the government used the required reasonable efforts to produce the informants is clearly erroneous. Unlike Judge Trask, however, and like Judge Hufstedler, I am convinced that the finding is, in these cases, clearly erroneous, for the reasons stated by Judge Hufstedler in also concluding that there was error as a matter of law. I am "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746. Therefore I concur, except in this one respect, in Judge Hufstedler's dissent.

ELY, Circuit Judge (concurring and dissenting):

I concur in my Sister Hufstedler's opinion, based, as it is, on the solid precedential authorities of our court. I would go further, however, since I adhere to the views that I long ago expressed in *Velarde-Villarreal v. United States*, 354 F.2d 9 (9th Cir. 1965), particularly in the last two paragraphs thereof at pages 15 and 16.

HUFSTEDLER, Circuit Judge (concurring and dissenting):

I concur in Part II of the majority opinion holding that *United States v. Demma* (9th Cir. *en banc* 1975) 523 F.2d 981 is retroactive, and reversing Robles' conviction. I dissent from the remainder of the opinion.

The majority opinion places the activities of the Government and those of the infor-

mants in a more benign light than is warranted under all of the circumstances. As the Government knew all along, Murrieta and Borjorquez are both citizens and residents of Mexico. For about a year and a half before the Hart-Robles episode, DEA had used Murietta's services as an informant. Agent Lugo had employed Murietta in 16 different investigations during the period, 10 of which (including that involving Hart and Robles) were conducted entirely within the United States. Murrieta owns a small store in Mexico. Borjorquez was a day laborer and field worker whose total annual earnings, aside from informing, were about $400. Neither informant was on a regular payroll. They were paid "rewards" for successful "investigations." DEA paid them nothing if their activities did not produce an arrest. If an arrest resulted, DEA increased their compensation proportionately to the amount of contraband seized. For their services in the Hart-Robles matter, Murrieta was paid $950, and Borjorquez was paid $350. Murrieta was regularly receiving very substantial payments for his informing activities. Borjorquez knew that a successful foray into the United States could and did yield him almost as much money for a few days' work as he could earn at hard labor in a year in Mexico. The Government gave the informants no training and virtually no supervision. The informants were simply unleashed to set up drug and narcotics transactions in this country. Murrieta picked his own investigatory targets. When he wanted to report his activities, he telephoned Agent Lugo. Agent Lugo never initiated calls; indeed, he did not know their home telephone numbers, if any, or their home addresses. He did learn the address of Murietta's store during the Borjorquez interview. He also knew that the informants regularly retreated to Mexico after an arrest. Agent Lugo saw the informants from time to time, including an occasion when Murrieta appeared to testify in another trial in May 1974, after Hart and Robles had been arrested. At that time, the Government knew that Murrieta would be a mate-

rial witness in a later prosecution of Hart and Robles.

The Government's use of these alien bounty hunters created grave dangers of abuse. These informants had neither knowledge of legal limitations upon the conduct of American law enforcement personnel nor any motivation to respect the rights of those whom they chose as targets. The reward system maximized the "temptations to produce as many accuseds as possible at the risk of trapping not merely an unwary criminal but sometimes an unwary innocent as well." (*Velarde-Villarreal v. United States* (9th Cir. 1965) 354 F.2d 9, 13). "[S]ince the Government chooses to utilize such agents, with the attendant risk of entrapment, it is fair to require the Government which uses this inherently dangerous procedure to take appropriate precautions to insure that no innocent man should be punished." (*Id.*) We thereupon imposed on the Government the burden of proving that it used reasonable efforts to produce a Government informant whose presence has been appropriately requested by a defendant.

### A.

The clearly erroneous standard of review does not apply to our determination of the question whether the district court correctly applied the reasonable efforts test to the undisputed facts, but, even if the standard were applicable, the district court's decision should be reversed.

The district court did not make any factual findings, and there was no occasion for them. Assuming, as we do, that the court believed Agent Lugo's testimony, no factual issues were presented for the court to resolve. Our court has held repeatedly that the clearly erroneous standard is irrelevant to a conclusion based on the application of a legal standard, even if that conclusion is labeled a finding of fact. "When a finding

is essentially one dealing with the effect of certain transactions or events, rather than a finding which resolves disputed facts, an appellate court is not bound by the rule that findings shall not be set aside, unless clearly erroneous, but is free to draw its own conclusions." (*Fleischmann Distilling Corp. v. Maier Brewing Co.* (9th Cir. 1963) 314 F.2d 149, 152 n. 2, *quoting with approval, Stevenot v. Norberg* (9th Cir. 1954) 210 F.2d 615, 619. *Accord: Lundgren v. Freeman* (9th Cir. 1962) 307 F.2d 104, 115 (collecting numerous cases.).)[1]

To be sure, the reasonable efforts test is not a legal concept that is drained of all factual essences. Conduct cannot be deemed reasonable or unreasonable in a factual vacuum. Conduct that is reasonable under some circumstances is wholly unreasonable under others. Reasonableness rules have developed in many areas of the law in recognition that *per se* rules are often unworkable, and, even if they are workable, they would tend to defeat the very purposes of the law that they were intended to implement, or they would produce results that would be generally perceived as unjust or downright foolish. For example, we would not attempt to justify a rule that a reasonable time to perform a contract is always ten days.

The existence of factual ingredients in the legal mix does not transmute the application of this legal standard into a factual question. Our obligation to inquire into the propriety of the district court's application of the reasonable efforts test is akin to the inquiry that we constantly make into the sufficiency of evidence to sustain a finding or a judgment. After giving the trier of fact all of the intendments that are the trier's due, we must confront the legal question of sufficiency of the evidence or reasonableness of the Government's efforts without the novocaine of the clearly erroneous rule. It is no more possible to state a precise formula for measuring this kind of

---

1. These are civil cases, but no reason exists to apply a more restrictive standard of appellate review to criminal cases. On the contrary, a respectable argument can be made that deeper, rather than shallower appellate scrutiny should be given to criminal cases because the societal and personal stakes in criminal cases are often larger than in civil cases.

legal error than it is to produce an encompassing definition of what is reasonable under the circumstances. The components of the district court's conclusion are a blend of factual determinations and decisions on issues of law. Even questions of the relevance of evidence combine facts with law. Consideration of steps that the Government could have but did not take is as relevant to the reasonableness decision as is consideration of the steps the Government did take. But the availability of alternatives hinges on questions of law as well as of fact, and questions of policy as well as interpretation of precedents.

The majority's view that the Government carried its burden of proving that it used reasonable efforts to produce these informants reduces that burden to feather lightness. "Reasonable efforts" in this case is diminished to "try a little." That result cannot be squared with the concerns that engendered the rule. The rule was created to minimize the risk of entrapment that "this inherently dangerous procedure" produces and to minimize the risk that unbridled governmental zeal will trench upon a defendant's constitutionally guaranteed right to a fair trial. The line between creating opportunities for criminally disposed persons to follow their bent and entrapping the unwary innocent is not easily drawn. Neither is it simple to decide whether the Government has participated, by "suggestion, procurement, or negligence," in the unavailability of a witness, which is a denial of due process (*United States v. Mendez-Rodriguez* (9th Cir. 1971) 450 F.2d 1, 5; *United States v. Tsutagawa* (9th Cir. 1974) 500 F.2d 420), and a failure to use reasonable efforts to produce a government informant whose departure was aided by his reward money, which only potentially leads to a dismissal of an indictment. I cannot countenance any lightening of the Government's burden of proving reasonable efforts in terrain as ringed as this is with the dangers of entrapment and of due process deprivation. The Government failed to carry its reasonable efforts burden in these cases.

### B.

I could not join the majority opinion even if I thought that the clearly erroneous standard was appropriate. As Judge Learned Hand observed: "It is idle to try to define the meaning of the phrase 'clearly erroneous'; all that can be profitably said is that an appellate court, though it will hesitate less to reverse the finding of a judge than that of an administrative tribunal or of a jury, will nevertheless reverse it most reluctantly and only when well persuaded." (*United States v. Aluminum Co.* (2d Cir. 1945) 148 F.2d 416, 433. *See also* 5A Moore's Federal Practice (1975 ed.) ¶ 52.-03[1], pp. 2613–2627.)

I am well persuaded that the evidence was insufficient to establish that the Government's efforts were reasonable under the circumstances. The only efforts that the Government made to produce the informants were those of Agent Lugo. In several telephone conversations initiated by the informants, he asked them to appear, and one or both of them promised to do so. He also offered to drive them from Nogales to Tucson, if they would leave Mexico, travel to Nogales, and call him. They did not comply. He relied on their promises to appear made during his telephone conversations with them even after Murrieta broke his earlier promise to attend a scheduled pretrial interview. Although the Government knew that both were potential material witnesses and that Murrieta was a key witness, it paid them in full for the Hart-Robles set-up and continued to employ them for other investigations. Although Murrieta and Borjorquez were cooperative in the bounty hunting phase of their activities, the Government knew that they were reluctant to be witnesses. Murrieta had appeared once in a different case; he never made any appearance in the Hart-Robles cases and repeatedly broke his promises to do so. Borjorquez never testified in any case, but he did appear for one interview. He, too, repeatedly broke his promises to Agent Lugo. The Government also knew that both informants regularly left the country and could not then be reached by

process. Despite that knowledge, the Government did not detain them as material witnesses, nor did it arrange to take their testimony by deposition. (18 U.S.C. § 3149; Rule 46(b) Fed.R.Crim.P.; *United States v. Verduzco-Macias* (9th Cir. 1972) 463 F.2d 105; *Bacon v. United States* (9th Cir. 1971) 449 F.2d 933.) It did not withhold their pay. (*Contrast United States v. Verduzco-Macias, supra.*) On the contrary, the Government paid them in full, thus assuring them adequate funds to arrange their own transportation to Mexico.

Accordingly, I would reverse both convictions and remand the cases to the district court for further proceedings consistent with the views herein expressed.

Circuit Judges KOELSCH, BROWNING and ANTHONY M. KENNEDY concur in Judge HUFSTEDLER's concurring and dissenting opinion. Circuit Judge ELY concurs in Judge HUFSTEDLER's opinion and files a separate opinion. Judge DUNIWAY concurs in part B of Judge HUFSTEDLER's concurring and dissenting opinion, and files a separate opinion.