**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Morgan JACKSON,**
**Defendant-Appellant.**

**No. 75–3489.**

United States Court of Appeals,
Ninth Circuit.

Oct. 12, 1976.

Kent Ten Brink, Los Angeles, Cal., for defendant-appellant.

William D. Keller, U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before BARNES, HUFSTEDLER and CHOY, Circuit Judges.

CHOY, Circuit Judge:

James Jackson appeals from a conviction for possession of heroin. We affirm.

## Background

In June 1975, a confidential and untested informant told local police and Drug Enforcement Administration (DEA) agents that a person named "James" had telephoned the home of Archie Acklin concerning a pending narcotics purchase by the caller. The informant was Acklin's mother-in-law, who was living with her daughter and Acklin. She gave the telephone number left with her by "James" to a DEA agent, who discovered that it was registered in Bessemer, Alabama to the step-father of James Jackson and of James's older brother named Ernest Jackson. A description of this James Jackson was obtained from DEA agents in Alabama.

Several days later the informant provided officers with a Los Angeles telephone number at which "James" could then be reached. The number was registered to a Gayle Jackson in a building owned by Ernest Jackson. At the time that "James" could be reached in Los Angeles, Alabama agents reported that James Jackson was "not in town" at his home in Alabama.

On or about June 9, the informant reported that James had given Acklin about $10,000 in cash, that the money was at Acklin's home, and that she had seen it. She said that Acklin would take the money out of the apartment when the narcotics transaction was to be completed. From then until the night of June 12, she was in daily contact with the officers, reporting that the money was still there. Late on June 12 she reported that the money had been taken. Surveillance was immediately established on the Jackson apartment building. At about 1:10 a.m. on June 13, a man recognized as Acklin drove up and entered the building, leaving about 10 minutes later. While Acklin was there, a light was on in the Gayle Jackson apartment. It was turned off within a minute and a half after Acklin's departure. Surveillance was con-

tinued through the night without further incident.

At about 11:45 a.m. the next morning, James Jackson was seen leaving the building carrying a suitcase. He and another man drove to the Los Angeles Airport and stopped at the Delta terminal. The agents had already learned that Delta had a flight to Birmingham, Alabama at 12:15 p.m. When the car stopped, Jackson got out and started walking toward the Delta baggage area, carrying the suitcase. At that time a DEA agent said to Jackson, "Federal Narcotics Agent; I'd like to talk to you," and a policeman said "Police." Jackson looked back at the officers, immediately dropped the suitcase, and continued walking away in a hurried manner. After taking about three steps, Jackson was arrested.

Jackson was taken to a police car. After being warned of his rights, he agreed to talk. He denied dropping the suitcase, saying that it was not his and that he had never seen it before.

The suitcase was taken by the officers to the federal courthouse, where a search warrant was obtained. The case was found to contain 116.4 grams of 21.2 per cent pure heroin.

Jackson moved to suppress the heroin. The district court denied the motion, ruling that Jackson lacked standing to object to the search and seizure of the suitcase because he had abandoned it. If the defendant had standing, however, the court suggested that the motion would have been granted since the search warrant was inadequate and the arrest had been made without probable cause. Jackson was subsequently convicted.

The Government does not argue to us that the search can be justified by an adequate warrant. Instead, the focus on appeal is on the issue of standing—whether the intrusion into the suitcase was a "search" or "seizure" at all, since there is no "search" or "seizure" if nobody has any fourth amendment privacy interests in the property.

*Abandonment and Standing*

Only a person whose privacy is invaded by a search has standing to object to it under the exclusionary rule as codified in F.R.Crim.P. 41(e). *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). If a person has voluntarily abandoned property, he has no standing to complain of its search or seizure. *Abel v. United States,* 362 U.S. 217, 240–41, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).

Jackson argues that by being charged with possession he automatically has standing concerning that item which he is alleged to have possessed. The trial court held that he could have possessed the suitcase, then abandoned it, losing standing, and still be charged with the prior possession. Subsequently we came to the same conclusion in *United States v. McLaughlin,* 525 F.2d 517 (9th Cir. 1975), where we affirmed convictions for possession of marijuana over fourth amendment objections even though admission of the contraband was justified on the basis of abandonment.

The issue, therefore, is a factual one: Did Jackson's actions constitute an abandonment of the suitcase? Abandonment is primarily a question of intent, and intent may be inferred from words, acts, and other objective facts. *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir. 1973); *United States v. Cowan,* 396 F.2d 83, 87 (2d Cir. 1968). Abandonment here is not meant in the strict property-right sense, but rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search. *United States v. Colbert,* 474 F.2d at 176; *cf. Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

The question is complicated in this instance by the possibility that the acts taken to establish the abandonment may have been brought about by unlawful police conduct. If so tainted, they cannot be considered by us.

The attempt by the officers to stop and talk to Jackson was legitimate if based

on "founded suspicion" rather than a "lucky hunch." *United States v. McLaughlin,* 525 F.2d at 520. Certainly founded suspicion existed here, and Jackson does not contest such a conclusion.

### Pre-Arrest Abandonment

■ The district court ruled, however, that Jackson's arrest was illegal for lack of probable cause. If so, then Jackson's oral denial of an interest in the suitcase was tainted and could not be considered, as it came while he was in custody. That left as the only admissible evidence that Jackson had abandoned the suitcase, his dropping the case and walking three steps away when the DEA agent and policeman addressed him. The district court found that to be sufficient to establish abandonment. We disagree, even on the "clearly erroneous" standard by which such rulings of fact mixed with law in criminal matters are judged on review. *See United States v. Hart,* 546 F.2d 798 (9th Cir. 1976) en banc. We hold that Jackson's action prior to his arrest did not constitute abandonment of his rights in the suitcase. In the cases cited by the Government in support of the district court's finding, the facts were far more indicative of a relinquishing of privacy interests in the property. In *McLaughlin,* the contraband was thrown out of a moving truck as the police were pursuing. In *Colbert,* the defendants put the briefcases down and denied an interest in them, the denial not being tainted as it was here. In *United States v. Maryland,* 479 F.2d 566 (5th Cir. 1973), the defendant pushed the contraband behind the seat of a police car in which he was being taken after arrest. We are not persuaded that the simple acts alone of putting a suitcase down and walking on a few stops before being stopped indicate an intent to abandon the suitcase.

### Legality of the Arrest

The Government also argues, however, that the arrest of Jackson was legal, so that

his disavowal of the suitcase while in custody can be considered. If the information possessed by the officers at the time of the arrest, as detailed above, can all be taken as reliably established, then there seems to be little question that the arrest was justifiable. The difficulty—and the apparent reason for the trial court's ruling otherwise—is that much of the information came from Acklin's mother-in-law, an informant conceded by the Government to have been "untested." Indeed, the reason for believing that narcotics were involved came from her tips. Probable cause would be lacking if credit could not be given to those tips.[1] It is because the district court refused to give credit to the uncorroborated portions of the untested informant's tips, finding her not to have been established as reliable, that probable cause for the arrest was found lacking.

■ For establishing probable cause to obtain a search warrant, the Supreme Court has enumerated standards for the use of informants' tips. Those standards are not entirely clear. There was, for instance, no opinion supported by a majority in *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). In general, though, we can say that there must be a showing that an informant is reliable and an indication from the "underlying circumstances" that the information given is valid. *See Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

■ The informant here was untested, so there was no previous experience to qualify her. Prior dealing is not the only basis for establishing reliability, however. We may consider the underlying circumstances, including those portions of the information verified by the police, and other factors supporting the informant's reliability and the probable truthfulness of the information given. *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723

---

1. The agent's suspicions, predating the tips from the informant, that Acklin and Ernest Jackson were involved in narcotics activity

cannot be accorded any weight. *Spinelli v. United States,* 393 U.S. 410, 414, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

(1971); *United States v. Wong,* 470 F.2d 129, 131 (9th Cir. 1972).

In *Wong* we accepted as a sufficient basis information similar to this. We observed, at 131:

> The informant in this case was acquainted with persons involved in violent crimes. She placed herself in danger when she gave the information she did give to the police. A baseless accusation in these circumstances is not likely. Further, we have here not an isolated report corroborated by an officer's knowledge of one crime, but information on two separate crimes. And the second time the officer spoke to the informant she added to the information she had given earlier on one of the crimes. Finally, the information itself, names and times, is not of the type likely to circulate in rumors.

Two separate crimes were not involved here as in *Wong,* unless the narcotics sale is viewed as a separate offense. The violations here were not in themselves violent, though we note that there is often violence connected with the narcotics trade. Nonetheless, the situations seem comparable to us. The informant here was the mother-in-law of the alleged supplier, living in the same home and taking his phone messages, with the opportunity to gather the information, but also vulnerable to retaliation.[2] She gave not just a single tip, but much information over a period of time. The authorities were able to check several pieces of the information given. The out-of-town phone number of "James" was linked to James Jackson in Alabama. When "James" came to Los Angeles, Jackson was "out of town" back in Alabama. The Los Angeles phone number was registered to a Gayle Jackson in a building owned by Ernest Jackson, James's brother. The meeting between Acklin and Jackson took place when the informant said it would, after Acklin took the money from his house, and it occurred at the Jackson apartment identified by the phone number she provided. The fact that these verified bits did not relate directly to the criminal activity does not mean that such corroboration cannot support belief in her credibility. *United States v. Woodring,* 444 F.2d 749, 750 n.1 (9th Cir. 1971). Her reliability is further bolstered by the specificity of the tips she gave—the name "James," the phone numbers, the time the money left the house—which is not the kind of information likely to be passed around in rumors.

Under the example of *Wong,* we believe that the holding of the district court was clearly erroneous in not permitting reliance on the material provided by the informant. Viewing the totality of the information known by the officers at the time of the arrest, *United States v. Patterson,* 492 F.2d 995, 997 (9th Cir. 1974), we conclude that there was sufficient probable cause to support the arrest.

### Post-Arrest Abandonment

If the arrest were legal, then Jackson's denial while in custody of any interest in the suitcase may be considered. This case then more closely matches those cited by the Government, notably *United States v. Colbert,* 474 F.2d 174 (5th Cir. 1973). With that additional evidence, we hold that Jackson had abandoned the suitcase and thus lacked standing to object to its search.

Affirmed.

HUFSTEDLER, Circuit Judge (dissenting):

I dissent only from that part of the opinion holding that the district court was required to find that the informant's reliability and the reliability of the information that she gave was sufficiently corroborated to supply probable cause for Jackson's arrest. Although I disagree with the clearly erroneous standard of review that the majority of this court adopted in *United States v. Hart* (9th Cir. *en banc* 1976) 546 F.2d

---

2. We note that the informant did not originally appear at the suppression hearing. The hearing was reopened and she came forward to testify only after Acklin, her son-in-law, was arrested elsewhere on a heroin charge. The reason offered by the Government at the time was the danger to her life. Reporter's Transcript 189–90.

798, 804 (Hufstedler, J., dissenting), this panel is bound by the *Hart* rule. If *Hart* is to be applied to this situation, as the majority assumes, then I cannot agree that the district court's decision on the reliability issues can be overturned. The majority opinion simply substitutes its appraisal of the corroborative evidence for the district court's. Moreover, as the majority acknowledges, the "verified bits did not relate directly to the criminal activity." Corroboration of innocuous details will not pass the *Aguilar-Spinelli* test. (*Spinelli v. United States* (1969) 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637; *Aguilar v. Texas* (1964) 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723; *United States v. Larkin* (9th Cir. 1974) 510 F.2d 13.)