Brian T. YOUNG, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8056.

Court of Appeals of Alaska.

July 3, 2003.

Cynthia L. Strout, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

A police officer saw Brian Young shove a small object underneath a motel door, in an apparent attempt to hide the object from the officer. The officer handcuffed Young, then reached under the door and retrieved two crumpled pieces of tissue paper. The officer opened the tissue paper bundles and found several "rocks" of crack cocaine.

The State offers one justification for the officer's act of seizing and then opening the two tissue paper bundles: the State asserts that Young abandoned the tissue paper bundles when he shoved them under the door. We disagree. We conclude that Young's conduct did not constitute an abandonment of this property, but rather an attempt to conceal it.

Because the officer observed Young's attempt to conceal the property, the officer would have been authorized to seize (but not necessarily open) the tissue paper bundles under the "plain view" doctrine *if* the officer had had probable cause to believe that the tissue paper bundles were evidence of a crime. But the State does not argue that the officer had probable cause to believe that the tissue paper bundles contained illicit drugs—at least, not until he opened them. It there-

fore appears that the seizure of the tissue paper bundles was unlawful. Moreover, even assuming that the seizure of the tissue paper bundles was lawful, the officer had no authority to open the bundles without a warrant—because these bundles were not distinctive, single-purpose containers for transporting drugs. Therefore, the cocaine found inside the tissue paper bundles must be suppressed, and Young's conviction must be reversed.

### Underlying facts

Around midday on February 6, 2000, several Anchorage police officers responded to a disturbance at the Mush Inn Motel in Anchorage. While the officers were wrapping up their investigation, one of them noticed a young man (Brian T. Young) poke his head around the corner of a building. When Young observed the officers, he looked surprised, and then he ducked back out of the officers' sight.

Officer Pablo José Paiz decided to investigate. When Paiz went around the corner, he saw Young and another man conversing in an entryway inside the hotel. When these two men saw Paiz approaching, they separated and went in different directions: Young went down the stairs, while the other man went up.

Paiz decided to follow Young down the stairs. As he was coming down the stairs, Paiz saw Young crouching down on his knees, using both hands to "shov[e] ... something white under a doorway". Paiz believed that Young "was trying to hide something" from him.

Paiz walked up to Young and immediately handcuffed him. Paiz asserted that he did this to protect his own safety. (Young was not armed, and he made no aggressive movements, but the hallway in which they were standing was confined, and there were three closed doors nearby.)

After handcuffing Young, Paiz asked Young to tell him what he had shoved under the door. Young replied that he had not shoved anything under the door—that he had "simply been picking up a condom that he had dropped".

When back-up officers arrived, Paiz had them escort Young out of the hallway and back into the entryway. Paiz then swept his fingers under the door. He discovered two opaque pieces of crumpled tissue paper. Paiz opened these tissue paper bundles and found several rocks of crack cocaine. Based on this discovery, Young was indicted for fourth-degree controlled substance misconduct.[1]

### Did Young "abandon" the tissue paper bundles (for purposes of search and seizure law) when he tried to hide them under the door?

Before trial, Young asked the superior court to suppress the cocaine. Among other things, Young argued that suppression was required because (1) Officer Paiz lacked reasonable suspicion of criminal activity when he seized and handcuffed Young, and (2) Officer Paiz lacked the authority to open the tissue paper bundles without a search warrant. Young renews these arguments on appeal.

The State contends that Young's first argument (unlawful seizure of his person) is moot because Officer Paiz's discovery of the cocaine did not stem from the officer's act of stopping and handcuffing Young. With one exception (which we will explain), we agree with the State. Paiz observed Young shoving something white under the motel door while Paiz was coming down the stairs, before the officer made contact with Young. Even if the ensuing detention of Young was illegal, this illegal detention did not give rise to the officer's knowledge that Young had just shoved something under the door.

However, even though Paiz had seen Young shove the tissue paper bundles under the door, there is substantial reason to believe that the officer would not be authorized to reach under the door and seize Young's property unless the officer already had probable cause to believe that this property contained contraband or was otherwise evidence of a crime. The parties do not address this issue in their briefs. However, as Professor LaFave explains in his treatise on the law of search and seizure:

**1.** AS 11.71.040(a)(3)(A).

It is ... important to understand that while the ... observation [of an object in] plain view ... settles the lawfulness of the observation itself, it does not determine whether [an ensuing] seizure of the observed object would likewise be lawful.... [This] point was made by the [United States] Supreme Court in *Illinois v. Andreas,* [463 U.S. 765, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983),] where [the Court] cautioned that the plain view doctrine "authorizes seizure of illegal or evidentiary items visible to a police officer" only if the officer's "[physical] access to the object" itself has a "Fourth Amendment justification".

Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (3rd ed.1996), § 2.2(a), Vol. 1, pp. 399–400.

■ Thus, even though an officer may lawfully look through the window of a residence and observe contraband, the plain view doctrine does not justify the officer's entry into the residence to seize the contraband—because the police may not enter a residence without a warrant. The fact that the contraband is in plain sight within the premises "has no bearing upon the question of whether an intrusion into those premises may now be made for the purpose of seizing that contraband." *Id.* at 400. "By the same token," Professor LaFave explains, "if the plain view is of an object on the person of some individual, ... the seizure of that object from the person [must still] occur pursuant to a warrant, [or] incident to arrest, or ... under exigent circumstances." *Id.* at 401.

Professor LaFave points out that this same principle applies to the type of situation presented in Young's case:

[E]ven when the plainly viewed object could be seized without interfering with a person or entering upon protected premises, it cannot be said that the [officer's] right of seizure flows automatically from the plain view. Except when the object has been abandoned, the seizure itself constitutes an interference with "effects" protected by the Fourth Amendment, and this means that[,] in the absence of a search warrant[,] some recognized ground for warrantless seizure, equally applicable outside plain view cases, must be present.

*Id.* at 401.

Thus, it appears that Paiz may have violated Young's rights when he seized the tissue paper bundles without first having probable cause to believe that they constituted evidence of a crime. Moreover, even if we assume that Paiz had the authority to reach under the door and retrieve the tissue paper bundles, Paiz would not have been authorized to open them (without first obtaining a warrant) unless he knew that these bundles were distinctive, single-purpose containers used for carrying illicit drugs.[2]

On appeal, the State does not argue that Paiz had the authority to retrieve and seize the tissue paper bundles from underneath the door. Nor does the State argue that, after Paiz retrieved the tissue paper bundles from underneath the door, he recognized them as distinctive, single-purpose containers used for carrying illicit drugs—thus authorizing him to open the bundles and inspect their contents. Rather, the State attempts to circumvent these Fourth Amendment problems by arguing that the tissue paper bundles were "abandoned" property—that Young voluntarily relinquished all interest in the tissue paper bundles when he shoved them under the door.

■ For Fourth Amendment purposes, a person who abandons property gives up any expectation of privacy in that property. *State v. Salit,* 613 P.2d 245, 255 (Alaska 1980). In Young's appeal, the State relies on the converse of this statement: the State contends that a person who jeopardizes their expectation of privacy in an article of property thereby "abandons" it. Thus, the State argues, when Young shoved the tissue paper bundles under the door, relinquishing direct physical control over these objects and putting them in a place where (at least potential-

---

**2.** *See Schraff v. State,* 544 P.2d 834, 847 (Alaska 1975) (upholding the seizure and ensuing warrantless search of an aluminum foil "slip" from the defendant's wallet, provided the officer was entitled to search the wallet in the first place); *Newhall v. State,* 843 P.2d 1254, 1259 (Alaska App.1992).

ly) others might observe and find them, Young abandoned any privacy interest in the tissue paper bundles.

But the State's basic premise is not true. While abandonment of property extinguishes a person's expectation of privacy in the property, there are many things that a person might to do diminish or defeat their expectation of privacy in an article of property that do not amount to abandonment of the property.

For instance, a person who loans property to a friend can not complain (for Fourth Amendment purposes) if the friend allows the police to search the property.[3] Similarly, if the property owner shares living space with another person, and this other person allows the police to enter and search the shared residence, the property owner can not complain if the police find the property (or observe some incriminating aspect of the property) during their search.[4] By the same token, if a person places their property on their lawn or on display in their window, and some incriminating aspect of the property is perceived by a passerby, the property owner can not complain.[5] Finally, the cases that come to this Court often present situations where people have consented to have the police examine or search through their property—their billfold or purse, the trunk of their vehicle, the pockets of their clothes. In all of these instances, the property owner has done something to diminish or defeat their expectation of privacy in the property, but in no sense has the property owner "abandoned" the property.

Abandonment occurs only when the property owner has discarded the property—that is, done something to objectively manifest the intent to give up *any and all* expectation

of privacy in the property, now and in the future. And here, the courts distinguish between the abandonment of property and unsuccessful attempts to hide property.

As noted by the Seventh Circuit in *United States v. Basinski,* 226 F.3d 829, 837 (7th Cir.2000), abandonment cases typically can be divided into three different categories. The first type of abandonment occurs when an individual intentionally discards an object in a public place—often jettisoning the article while fleeing from the police. *Id.* Under these circumstances, "[when] the presence of police is lawful and the discard occurs in a public place where the defendant cannot reasonably have any continued expectation of privacy in the discarded property, the property will be deemed abandoned for purposes of search and seizure." *City of St. Paul v. Vaughn,* 306 Minn. 337, 237 N.W.2d 365, 371 (1975).[6]

A second, related type of abandonment occurs when an individual places an object in a curbside trash container for collection. *California v. Greenwood,* 486 U.S. 35, 37, 108 S.Ct. 1625, 1627, 100 L.Ed.2d 30 (1988); *Smith v. State,* 510 P.2d 793, 796 (Alaska 1973). By discarding the object in this manner, the owner "leads reasonable people to believe that he no longer cares what becomes of his trash, or [of] articles mistaken for trash". *Basinski,* 226 F.3d at 837.

Finally, "an abandonment may arise out of a disclaimer of ownership which is made in response to police questioning." *LaFave,* § 2.6(b), p. 581. *See State v. Salit,* 613 P.2d 245, 258 (Alaska 1980) (holding that the defendant abandoned a garment bag when he repeatedly denied that it belonged to him). Under such circumstances, the individual

**3.** *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969).

**4.** *United States v. Matlock,* 415 U.S. 164, 171–72, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).

**5.** *See LaFave, supra,* § 2.2(a), Vol. 1, pp. 397–98.

**6.** *See, e.g., United States v. Williams,* 569 F.2d 823, 826 (5th Cir.1978) (finding abandonment of a trailer when the defendant pulled into a rest stop, unhitched the trailer from his truck, and drove away (leaving the trailer behind) when he realized that he was being followed by narcotics

agents); *United States v. McLaughlin,* 525 F.2d 517, 519 (9th Cir.1975) (finding that the defendants abandoned four kilos of marijuana when they threw it from their moving vehicle); *United States v. Eubanks,* 876 F.2d 1514, 1515–16 (11th Cir.1989) (finding that the defendant abandoned two twisted pieces of paper containing crack cocaine when he dropped them on the ground and walked away); *United States v. Thomas,* 864 F.2d 843, 846–47 (D.C.Cir.1989) (finding abandonment of a gym bag when the defendant put the bag down in the hallway and walked away).

who denies ownership of the item can not reasonably expect to retain any privacy interest in the item. *United States v. Tolbert,* 692 F.2d 1041 (6th Cir.1982). However, the disclaimer of ownership must arise from lawful police questioning. *Salit,* 613 P.2d at 256.

On the other hand, abandonment does not occur simply because a person temporarily relinquishes possession or control of an object. *LaFave,* § 2.6(b), p. 577. *Compare United States v. Thomas,* 864 F.2d 843, 846–47 (D.C.Cir.1989) ("The law obviously does not insist that a person assertively clutch an object in order to retain the protection of the fourth amendment.").

For example, in *United States v. Jackson,* 544 F.2d 407 (9th Cir.1976), a drug enforcement agent approached Jackson in an airport and said, "I'd like to talk to you." Jackson dropped his suitcase and took three steps before he was arrested. *Id.* at 409. On these facts, the Ninth Circuit refused to find abandonment: "We are not persuaded that the simple acts alone of putting a suitcase down and walking on a few steps before being stopped indicate an intent to abandon the suitcase." *Id.* at 410. Similarly, in *United States v. Boswell,* 347 A.2d 270 (D.C.App. 1975), the court found no abandonment when the defendant placed a blanket-covered object down in a hallway while he made a telephone call some 20 to 30 feet away. *Id.* at 273–74. Once again, the court explained that the defendant's actions were insufficient to show an intent to abandon the object. *Id.*

*See also Smith v. Ohio,* 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990) (finding that the defendant's act of throwing a paper bag onto the hood of a car was insufficient to constitute abandonment of the property); *People v. Campbell,* 160 A.D.2d 363, 364, 554 N.Y.S.2d 103 (1990) (finding insufficient evidence of abandonment where police officers testified that the defendant placed a paper bag on a newsstand shelf, but then disagreed as to whether she attempted to walk away or, instead, responded to the officers' request to stop and walk toward them).

In the present case, the superior court found that Young's act of slipping the tissue paper bundles under the motel door constituted abandonment. But even when viewed in the light most favorable to the superior court's ruling, Young's conduct does not appear sufficient to establish abandonment.

Young did not throw the tissue paper bundles away, nor did he even walk away from these bundles after he hid them beneath the door. Rather, Young simply crouched down and hid the tissue paper bundles in a location within his reach. As soon as Young stood up again, Officer Paiz handcuffed him. This series of events does not bespeak Young's clear intent to permanently relinquish ownership or control of the tissue paper bundles.

Moreover, even if Young had walked away from the door, the fact remains that Young did not discard the tissue paper bundles in a public place where anyone might discover and take possession of the property. Rather, Young placed the tissue paper bundles in a location that would conceal their presence and was not readily accessible to the public—beneath the door of a locked closet.

As our supreme court recognized in *Smith v. State,* 510 P.2d 793, 796 n. 9 (Alaska 1973), actions taken to conceal property do not constitute abandonment of the property.[7] Thus, in *Erickson v. State,* 507 P.2d 508 (Alaska 1973), the supreme court held that even though the defendant had left his suitcase hidden in a ditch, and even though the police had "abundant probable cause" to believe that the suitcase contained marijuana, the police could not open the suitcase without a warrant. *Id.* at 512.

A similar holding is found in *People v. Kelly,* 172 A.D.2d 458, 568 N.Y.S.2d 804 (1991). In *Kelly,* the defendant placed a brown paper bag inside a lobby wall opening—a receptacle for a yet-to-be-installed buzzer system, covered by a metal flap—and then walked back to sit on the building stoop. The court held that the defendant's conduct did not constitute abandonment of the bag.

In Young's case, his placement of the tissue paper bundles beneath the door indicates an intent to conceal them rather than abandon them.

**7.** *See also Ingram v. State,* 703 P.2d 415, 428 (Alaska App.1985) (same).

■ We do not believe that this result is affected by the fact that when Officer Paiz asked Young to tell him what he had placed under the door, Young denied placing anything under the door. This statement was not an express denial of ownership.[8] Moreover, Young's denial flowed directly from his unlawful seizure.

Here is where it makes a difference whether Officer Paiz had reasonable suspicion to justify his detention and handcuffing of Young. As we noted earlier, a finding of abandonment may arise when a defendant disclaims ownership of the property in response to police questioning. However, the disclaimer of ownership must arise from *lawful* police questioning. *State v. Salit,* 613 P.2d at 256.

Acts of abandonment prompted by unlawful police conduct are generally considered the tainted fruit of the illegality. *See United States v. Jackson,* 544 F.2d 407, 410 (9th Cir.1976) (holding that if the defendant's arrest was illegal, then his subsequent oral denial of ownership was tainted and could not be considered); *Cox v. State,* 586 So.2d 1321, 1322 (Fla.App.1991) (holding that when the defendant's act of abandoning or dropping a package of marijuana was prompted by or was the result of an illegal stop, the purported abandonment could not be used to justify a warrantless search); *State v. Belton,* 441 So.2d 1195, 1199 (La.1983) ("When police officers make an investigatory stop without the legal right to do so, property abandoned or otherwise disposed of as a result thereof cannot be legally seized."); *Comer v. State,* 754 S.W.2d 656, 659 (Tex.App.1986) (abandonment must occur "independent of any police misconduct").

In Young's case, the superior court found that Officer Paiz's temporary investigative detention of Young was justified because Paiz could reasonably suspect that Young was currently engaged in criminal activity after Young falsely claimed that he had not placed anything underneath the motel door. The problem with the superior court's analysis is that Young did not make this statement until *after* Paiz detained and handcuffed him.

At the time that Paiz handcuffed Young, all he knew was that Young was present at a motel that had a reputation as a place where illegal drug activity occurred (both drug deals and drug usage), that Young was apparently attempting to avoid contact with the police, and that Young had apparently slipped something under the door. The superior court expressly concluded that these facts, standing alone, did not support an investigative stop.[9]

In its brief to this Court, the State disagrees with the superior court, arguing that Officer Paiz had reasonable suspicion to justify an investigative stop, even before Young denied having placed anything under the door. The State notes that in *State v. Garcia,* 752 P.2d 478, 480 (Alaska App.1988), we held that drug trafficking is the kind of imminent public danger that can justify an investigative stop. And the State relies primarily on our decision in *Dimascio v. Anchorage,* 813 P.2d 696 (Alaska App.1991), to justify the investigative stop in Young's case.

In *Dimascio,* we upheld an investigative stop of a motorist who twice stopped to speak with a pedestrian in the middle of the street; each time, both the pedestrian and the motorist fled when the police approached. This activity occurred in the early morning (4:30 a.m.) in an area of Anchorage known for drug-trafficking.[10] But the facts of *Dimascio* were much more favorable to the

---

**8.** Compare Young's statement with the express and often repeated denials of ownership contained in the following cases: *United States v. Kendall,* 655 F.2d 199, 200 (9th Cir.1981) (defendant disclaimed ownership of luggage by pointing out that the claim numbers on the luggage tag did not match the claim numbers on his ticket); *United States v. Jones,* 707 F.2d 1169, 1170 (10th Cir.1983) (when confronted with the satchel that he had discarded, the defendant expressly denied ownership twice); *State v. Salit,* 613 P.2d 245, 256 (Alaska 1980) (the defendant

denied ownership of a garment bag even after the other passengers had left the terminal and there was no one else to claim it).

**9.** The court declared: "Officer Paiz could not have gone up [to Young] and frisked him based on what he'd seen, couldn't have cuffed him, couldn't have questioned him if Mr. Young had simply said, 'I don't want to talk to you' ".

**10.** *Id.* at 697.

State than the facts of the present case. As we explained in *Dimascio*,

> [T]he facts of Dimascio's case show more than an attempt to avoid contact with the police. Dimascio and the pedestrian parted hurriedly when they first saw the officer, came back to their place of rendezvous when they thought the officer gone, and then ran away at the sight of the returning police car. This pattern of activity is more suspicious than merely leaving an area at the approach of the police. Given the other circumstances—the lateness of the hour and the area's reputation for drug transactions—the actions of Dimascio and the pedestrian were sufficient to establish a reasonable suspicion that the two men were engaged in a criminal transaction when they were observed by [the officer]. Because both Dimascio and the pedestrian were fleeing from the scene in different directions, "a prompt investigation [was] required ... as a matter of practical necessity." *State v. G.B.*, 769 P.2d at 456 (quoting *Coleman v. State*, 553 P.2d at 46).

*Dimascio*, 813 P.2d at 699.

Certainly, Officer Paiz could take account of Young's apparent reluctance to have contact with the police, as well as the motel's reputation as the scene of illegal drug activity and the fact that Young had apparently tried to hide something under the door. But although Paiz could reasonably conclude that Young was trying to hide something from him, we do not believe that Paiz yet had reasonable suspicion that Young was guilty of drug trafficking.

In sum, we agree with the superior court that, at the time Paiz handcuffed Young, there was no reasonable suspicion to justify an investigative detention. Hence, even if Young's denial that he had slipped anything under the door could be viewed as tantamount to a denial of ownership (which we doubt), this statement was the fruit of an illegal seizure of Young's person.

Accordingly, the superior court erred when it ruled that Young had abandoned the tissue paper bundles when he slipped them under the door.

As we noted above, the State does not attempt to justify the warrantless seizure and ensuing warrantless opening of the tissue paper bundles on any ground other than abandonment. And no other exception to the warrant requirement appears to apply to these facts.

To summarize: Young did not abandon the tissue paper bundles; rather, he attempted to conceal them. Even assuming that Officer Paiz had the authority to seize the tissue paper bundles from underneath the door, he had no authority to open them without a search warrant.[11]

*Conclusion*

The superior court should have granted Young's suppression motion. The judgement of the superior court is REVERSED.

---

11. *Erickson,* 507 P.2d at 512.