**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose Luis PIZARRO and Miguel Rodriguez, Defendants-Appellants.**

**Nos. 82–1238, 82–1311.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 4, 1983.

Decided Aug. 26, 1983.

Rehearing Denied Oct. 20, 1983.

Michael B. Mann, Oakbrook Terrace, Ill., Michael G. Cheronis, Oak Park, Ill., for defendants-appellants.

Joseph N. Hosteny, III, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and NEAHER, Senior District Judge.*

NEAHER, Senior District Judge.

In this consolidated appeal, defendants Jose Luis Pizarro and Miguel Rodriguez challenge for a second time in this Court their convictions on charges of selling a quantity of heroin to undercover Drug Enforcement Administration ("DEA") agents in the Spring of 1979. Along with a third defendant, William Lara,[1] Pizarro and Rodriguez were originally tried and convicted on these charges in August 1979, but because of various prejudicial remarks made by the prosecutor during closing arguments, this Court reversed those convictions and ordered a new trial for all three defendants. *United States v. Rodriguez*, 627 F.2d 110 (7th Cir.1980). Following remand and after

extensive pre-trial maneuvering, the case again went to trial in October 1981, and on November 5th and 6th, a jury again found the defendants guilty. This time, however, the district court itself declared a mistrial as to Pizarro, ruling that its comments to the jury after they had convicted Rodriguez and Lara may have inadvertently coerced a verdict against him. Upon retrial, Pizarro was again convicted. The district court then sentenced Rodriguez to one year of incarceration and six years of special parole; Pizarro received a ten year jail sentence along with a fifteen year special parole term. Rodriguez and Pizarro now appeal from these separate trials.

## I. THE GOVERNMENT'S CASE

Despite the many proceedings which the adjudication of this case has necessitated, the essential facts gleaned from the record are relatively straightforward. The government through its proof at trial showed that in the early part of 1978 defendant Lara sought and obtained an introduction to a man he believed would be interested in arranging a large heroin transaction. As it turned out, this individual was actually a paid, confidential DEA informant, code-named "Mario," and, instead of assisting Lara in his endeavor, he introduced Lara to undercover DEA Agent Walter Peasant. Agent Peasant, posing as a buyer for a heroin syndicate, secured Lara's confidence, and after some preliminary discussions, Lara introduced Peasant to "his partner," Rodriguez. Both men assured Agent Peasant that they had good connections in the drug underworld and could obtain two to four kilograms of heroin from these suppliers; nevertheless, there were numerous false starts during the winter. Finally, in March 1979, Rodriguez informed Peasant that a reliable source had been obtained and an initial two-kilogram purchase could be accomplished. In order to facilitate this purchase, Rodriguez called Peasant on March 26, 1979, to set up the

---

* The Honorable Edward R. Neaher, Senior District Judge for the Eastern District of New York, is sitting by designation.

1. William Lara dismissed his appeal.

sale of a one-ounce "sample." As the transcript of this tape-recorded conversation reveals, Rodriguez believed Agent Peasant would be impressed with the high quality of the heroin and, if Peasant agreed, the two-kilogram sale could be effected the following day. That evening, Rodriguez met Peasant and in exchange for $800, sold him the ounce of heroin.

The next day, seven telephone conversations between Rodriguez and Agent Peasant were tape-recorded. In these conversations, Rodriguez explained that his heroin supplier was "paranoid" about potential police involvement, and was particularly uncomfortable with making the sale to someone other than Mario. Rodriguez informed Peasant that, because of this mistrust, he had called Mario to get "some more answers and information" about Peasant's background and, although Mario's responses had at least temporarily placated his source's fears, the transaction had to be delayed. In addition, new plans were made for the sale to be accomplished in two one-half kilogram lots followed by a third sale of one kilogram. Rodriguez assured Peasant that future transactions would be easier once the source became more comfortable dealing with Peasant.

Shortly after midnight on April 6, 1979, Rodriguez telephoned Agent Peasant at home. Rodriguez told him that he was with his source and that he was ready to deliver the first half-kilogram installment at the previously agreed price of $35,000 per kilogram. Peasant agreed and tentative arrangements were made for the transaction to be accomplished later in the day.

At 10:45 that morning, Peasant called Rodriguez to confirm the plans. Rodriguez stated that he was in the process of obtaining the money necessary for him to purchase the heroin and that barring unforeseen difficulties the transaction would be accomplished by afternoon. He also noted that Lara, who had been notably absent from the deal for some time, would deliver the heroin at a site to be designated once the heroin was secured. At 3:55 P.M., in an unrecorded call, Rodriguez informed Peasant that he had the money and was waiting with Lara for the source to call. Shortly thereafter, Rodriguez and Lara left the Rodriguez home and drove to the corner of Palmer and North Avers Avenue in Chicago, where they parked their car and entered the rear passageway of 2155 North Avers. At 5:30 P.M., in the third tape-recorded conversation of April 6, 1979, Rodriguez stated:

"Rodriguez: Yeah. I'm still waiting for the man.

S/A Peasant: Oh. Still waitin'.

Rodriguez: But ah. You know he's on his way 'cause ah. His wife and everything he said, he left. Ah. Over there.

S/A Peasant: Oh. He left already.

Rodriguez: Yeah. I think he went to pick up his stuff.

S/A Peasant: Yeah.

Rodriguez: He's got all kinds of runners, and everything bringing all the stuff for him.

S/A Peasant: Yeah.

Rodriguez: But, he's goin' to come here personally."

Approximately 10–15 minutes later, according to testimony supplied by DEA Agent Litten, defendant Pizarro arrived in the area of Palmer and North Avers and parked his car. He walked directly to 2155 North Avers, and after looking up at the windows for several seconds, he walked through the alley off Palmer and entered the rear area of the building. At 5:50 P.M., Pizarro left the building, entered his car and drove away.

Five minutes later, Agent Peasant again telephoned Rodriguez, and, in the fourth tape-recorded conversation of the day, Rodriguez told Peasant that he had given the source the money and was awaiting the arrival of the drugs, which he expected any moment. A half-hour later, however, Rodriguez was still waiting. But in the fifth recorded conversation of the day, Rodriguez told Peasant not to worry, "I know the guy."

At 6:30 P.M., Pizarro's automobile was again spotted by DEA surveillance agents

as it pulled into a parking space on the corner of Palmer and North Avers. Pizarro exited the car and again entered the rear area of 2155 North Avers, this time carrying a brown paper bag. Twenty minutes later, Peasant telephoned Rodriguez and learned that the drugs had arrived. Rodriguez told Peasant that Lara was leaving to deliver the heroin, and would meet Agent Peasant in the parking lot of a local restaurant.

A few minutes later, Lara and Rodriguez left 2155 North Avers in separate cars. After a short stop during which Rodriguez transferred a package to Lara, Lara drove to the designated rendezvous site and parked near Agent Peasant's automobile. At approximately the same instant, Rodriguez arrived in another automobile, drove past the other vehicles and parked across the street. Lara then delivered the heroin to Agent Peasant, and both Lara and Rodriguez were taken into custody.

A half-hour later, DEA agents returned to 2155 North Avers and knocked on both the front and back doors. A woman, later identified as Lucy Caban-Torres, opened the rear door and the agents entered the apartment. Inside, the agents discovered defendant Pizarro as well as the permanent occupant of the apartment, William Caban-Torres. Pizarro was seated in the living room, watching television, while Caban-Torres was discovered in the bathroom, flushing heroin down the toilet. A search of the apartment also revealed a further quantity of heroin in the kitchen.

Following their arrests, Rodriguez, Lara and Pizarro were charged in a five-count indictment with various federal narcotics law violations. In counts one and three, Rodriguez was charged with telephonic facilitation of the March 26th heroin sale in violation of 21 U.S.C. § 843(b). In count two, Rodriguez was charged with distributing the one-ounce sample of heroin in violation of 21 U.S.C. § 841(a). Count four charged both Rodriguez and Lara with using the telephone on April 6th to facilitate the distribution of the half-kilogram of heroin, another violation of 21 U.S.C. § 843(b).

Finally, in count five, all three defendants were charged with the distribution of the half-kilogram of heroin in violation of 21 U.S.C. § 841(a).

The theory of the defense, like the case presented by the government, was similarly straightforward. Although silent at the first trial, Rodriguez took the stand at the second trial and asserted the entrapment/coercion defense his counsel had argued to the jury at the first trial. He testified that Mario had badgered, cajoled and repeatedly threatened him into the drug transaction. He also presented two character witnesses who attested to his good reputation and his lack of any prior convictions.

For his part, Pizarro presented no evidence, choosing instead to argue in his opening and closing statements that the government had no "hard" proof associating him with the heroin venture. He pointed out that no witnesses ever saw him in possession of any illegal substance or even in the company of his co-defendants. He argued that the government's best evidence of criminality, the brown paper bag he was seen carrying, actually contained beer, not heroin, and that the other incriminating evidence also fit William Caban-Torres. Hence, he contended that the government's circumstantial case was insufficient to prove him guilty beyond a reasonable doubt. As previously noted, however, the juries in the second and third trials rejected both Rodriguez's and Pizarro's claims.

## II. RODRIGUEZ'S APPEAL

Rodriguez raises several issues on appeal, the majority of which concern the disappearance of Mario, the government's paid informant, prior to the commencement of the second trial. Rodriguez contends first that the district court erred in not dismissing the indictment against him once it became clear that Mario would be unavailable to testify at the second trial. Alternatively, he argues that the court abused its discretion in refusing his proposed missing witness instructions, and in foreclosing any argument concerning the inferences to be

drawn from Mario's absence. In addition, he contends that the court erred when it quashed the bench warrant for Mario's arrest following the judgment of conviction but during the pendency of this appeal. Finally, Rodriguez takes issue with the trial court's decision not to limit the government's cross-examination of his testimony at the second trial.

### A. The Motion to Dismiss

At the first trial, the government called Mario in support of its case in chief. Following this Court's reversal of the first trial and the return of the mandate to the district court, Rodriguez filed a motion requesting "the government to exercise such effort as is reasonably necessary to make the informant available for trial and to notify defendant immediately should the government discover that the informant has become for any reason unavailable." At a status hearing held on January 19, 1981, the government agreed to make Mario available, but refused to provide the defendants with Mario's address or phone number on the grounds that he was then engaged in an active DEA undercover operation and the disclosure of such information could endanger the investigation and Mario's life. Shortly after this hearing, however, Mario abruptly disappeared from his DEA assignment. According to the DEA agents supervising Mario's investigative activities, Mario fled after one of the suspects of the undercover operation accused him of taking a portion of a drug shipment which the agents had just seized. Although Mario subsequently admitted to the theft, he initially accused the DEA agents of "setting him up," and after being interrogated by the DEA agents, he left his hotel room and went into hiding. In a telephone call on February 2, 1981, Mario informed one of the supervising DEA agents that he felt his life was in danger, and he adamantly refused to disclose his location.

On March 17, 1981, pursuant to a letter sent by the government to defense counsel, a status hearing was held to discuss Mario's disappearance. The government informed the district judge of the circumstances surrounding the disappearance and indicated that an investigation was under way. Upon Rodriguez's oral motion, which the government did not oppose, the court issued a bench warrant for Mario's arrest and extended the trial date. Several days later, Rodriguez filed a motion to dismiss the indictment on the ground that the government's failure to produce its informant violated both his Sixth Amendment rights to confrontation and compulsory process as well as his due process rights to present a defense and to a fair trial. After holding a two-day evidentiary hearing into the entire issue, the district court concluded that the government was not responsible for either Mario's disappearance or his present unavailability and accordingly denied the motion to dismiss. On appeal, Rodriguez claims that this ruling was both factually and legally deficient. We do not agree.

█ The law in this Circuit has long been that when a defendant asserts a defense based on the alleged misconduct of a confidential government informant, he is entitled to receive reasonable cooperation from the government in securing the informant's appearance at trial. *United States v. Cansler,* 419 F.2d 952, 954 (7th Cir.1969), *cert. denied,* 397 U.S. 1029, 90 S.Ct. 1278, 25 L.Ed.2d 540 (1970). The government does not, however, become a guarantor of its special employee's presence at trial. *United States v. Thornton,* 582 F.2d 993 (5th Cir. 1978); *United States v. Hart,* 546 F.2d 798, 799, 802–03 & n. 8 (9th Cir.1976) *(en banc)* (citing cases), *cert. denied,* 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 571 (1977). Nevertheless, should an informant disappear, the government bears the burden of demonstrating first that it did not cause the disappearance, and second that it made a reasonable effort to locate the informant for trial. *United States v. Cansler, supra,* 419 F.2d at 954.

█ Applying these principles to the case at hand, we are persuaded that the government's explanation of the cause of Mario's absence more than met its burden under the first prong of this test. The cause of Ma-

rio's disappearance could in no way be attributed to governmental misconduct. His theft of the heroin and his subsequent flight were volitional acts that the government neither condoned nor assisted in any way. Thus, we agree with the district court that this was not a case where the government engineered the disappearance of a witness, but rather an instance where the witness actively sought to evade discovery by the government.

■ Rodriguez nonetheless argues that the government had the obligation to prevent Mario from fleeing prior to trial, and that its failure to employ any preventive measures against such an eventuality was the actual cause of his unavailability. This contention, however, ignores the practical restraints which existed prior to Mario's disappearance: Until his flight in January of 1981, Mario was actively working for the DEA under the direct, daily supervision of DEA agents who were aware of his obligation to testify in the instant case. This arrangement in itself provided a high degree of assurance that the government would be able to locate and produce Mario at trial. Moreover, without some reason to anticipate Mario's flight, the government's ability to actually detain Mario was severely limited, see 18 U.S.C. §§ 3146, 3149; *United States v. Verduzco-Macias,* 463 F.2d 105, 107 (9th Cir.), *cert. denied,* 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972), and given Mario's previously cooperative attitude, its failure to attempt such an extraordinary step can hardly be considered unreasonable, or a factor in Mario's unavailability. *See United States v. Hart, supra,* 546 F.2d at 800.

Rodriguez's other objections to the district court's ruling are similarly without merit. Relying on *United States v. Lynch,* 499 F.2d 1011 (D.C.Cir.1974), he argues first that the government's search was patently defective because no agent bothered to check "local hospitals, area police departments, the morgue or ... [past] employers." *Id.* at 1024. The facts of this case, however, differ materially from those present in *Lynch.* In *Lynch,* the government already knew the general location of the errant witness, but nevertheless failed to contact any of the local public agencies which might have had information relevant to their search. *Id.* In this instance, the government had no idea where Mario had gone and despite contacting every DEA office where Mario was known to have worked, checking every known former address, phone number and automobile registration, and communicating with the Secret Service, the Bureau of Alcohol, Tobacco and Firearms, and the Immigration and Naturalization Service, the government was unable to develop any leads as to what city he might be in. Under these circumstances, the government could scarcely be expected to begin checking local hospitals and police departments. Moreover, since a bench warrant was outstanding, any local arrest would likely have led to the discovery that he was sought by the federal authorities. With respect to past employers, the government established that it was unable to uncover the names of employers other than the DEA. Finally, the uselessness of checking the morgue in furtherance of a search for live testimony, of course, speaks for itself.

■ In his final attack on the reasonableness of the government's investigation, Rodriguez argues that the search should have commenced immediately upon Mario's disappearance from his DEA assignment in January, rather than after the district court set the case for trial one month later. While we agree that such expedience would have been desirable, we cannot say that this short delay rendered the subsequent investigation unreasonable as a matter of law. Not only is it difficult if not impossible to say that a concerted effort during February would have produced what the subsequent four-month investigation failed to accomplish, but the evidence adduced at the evidentiary hearing indicated quite the opposite. After Mario disappeared from DEA supervision, he contacted the DEA offices in El Paso and New York by telephone. According to the DEA agents who spoke with him, he was hostile and evasive, re-

fusing to provide any information about his location. None of these calls could be traced. Consequently, the government had no better information in February than it had when the search commenced in March. Of course, with the benefit of perfect hindsight, it could be argued that the government should have known that Mario would have been difficult to locate, and thus any delay was indicative of a lack of diligence. However, such *post hoc* reasoning "does not thereby establish conclusively that there was no reasonable effort made to produce him," and we decline to reverse the district court's contrary conclusion on the basis of such speculation. *United States v. Hart,* *supra,* 546 F.2d at 801.

▇ In any event, even if we were to conclude that the government failed to make a diligent search, we would nevertheless reject Rodriguez's challenge on the ground that Mario's unavailability did not prejudice Rodriguez's defense. As the Supreme Court has recently instructed us, absent some showing of intentional governmental misconduct, a defendant "can establish no Sixth Amendment [or Due Process Clause] violation without making some plausible explanation of the assistance he would have received from the testimony of the [missing] witness." *United States v. Valenzuela-Bernal,* 458 U.S. 858, 871, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982).[2] Such an explanation is entirely lacking in Rodriguez's appellate briefs, and we have been unable to discover any indication in the record which would support a claim that Mario would have provided testimony favorable to Rodriguez's entrapment/coercion defense. To the contrary, the record reflects that Mario's testimony at the first trial was wholly adverse to this theory of defense. He testified that both Lara and Rodriguez independently sought his assistance in the heroin transaction, and were

both eager to consummate the deal with Agent Peasant, often calling him several times a day for information needed to facilitate the deal. He also denied ever threatening either defendant during the course of the negotiations leading up to the March 26th and April 6th sales; and despite a vigorous and thorough cross-examination, adhered to this version of the events. Without something more than Rodriguez's own speculation, we can only conclude that Mario's testimony at the second trial would have remained adverse to Rodriguez's defense. *See United States v. Perlman,* 430 F.2d 22, 26 (7th Cir.1970).

### B. *Missing Witness Instructions*

In two related arguments, Rodriguez takes issue with the trial court's presentation of Mario's absence to the jury at the second trial. He contends first that the trial court erred when it instructed the jury that "[Mario] is unavailable to testify in these proceedings through no fault of any party. You should not draw any inference from this person's unavailability to testify." He argues that the government's failure to call its own informant formed a proper foundation for the jury to infer that Mario's testimony would have been adverse to the government's case and, under *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893), he was entitled to such an instruction. Second, he challenges the court's decision to preclude any argument concerning Mario's absence that might have been inconsistent with the instruction cited above. He claims that even if the jury could not be instructed as a matter of law on the inferences to be drawn from Mario's absence, he should at least have been permitted to argue the point during his closing statement. Neither contention has merit.

---

**2.** While the Court in *Valenzuela-Bernal* was concerned with the constitutional problems associated with the deportation of illegal aliens who had witnessed a criminal incident, there appears to be no reason not to require some showing of materiality in cases such as this. *United States v. Long,* 533 F.2d 505, 508 (9th

Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976); *see United States v. Calzada,* 579 F.2d 1358, 1365 (7th Cir.) (Cummings, J., dissenting), *cert. dismissed,* 439 U.S. 920, 99 S.Ct. 294, 58 L.Ed.2d 266 (1978); *cf. United States v. Perlman,* 430 F.2d 22, 26 (7th Cir. 1970).

As this Court made clear in *United States v. Mahone*, 537 F.2d 922, 926–28 (7th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976), a jury may be allowed to draw an adverse inference from one party's failure to produce a knowledgeable witness only if the evidence shows that the witness was either physically or pragmatically available to only one party. This requirement states the premise behind a missing witness instruction: If the jury is to be permitted to infer that one party is withholding negative testimony, then the evidence must reflect the other party's inability to present that same testimony. *United States v. Ariza-Ibarra*, 651 F.2d 2, 16 (1st Cir.1981), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1982). Thus, where a witness is equally available to both sides, the inference of concealment loses its logical force, and no instruction need be given. *Id.* at 17. As a corollary to this principle, no inference can be drawn if the evidence shows that through neither party's fault the witness was physically *unavailable* to both parties, since the party who might be expected to call the witness is unable to do so. *United States v. Peterson*, 424 F.2d 1357, 1362 (7th Cir.), *cert. denied*, 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 266 (1970); *see United States v. Johnson*, 562 F.2d 515, 517 (8th Cir.1977); *United States v. Wilson*, 534 F.2d 375, 377–78 (D.C.Cir.1976). The facts of this case illustrate this point. As noted above, the evidence presented by the government at the hearing on the motion to dismiss showed Mario's absence to be unrelated to any governmental misconduct. Thus, even though we might conclude that Mario's testimony could only have been produced by the government, *see United States v. Tucker*, 552 F.2d 202, 209–10 (7th Cir.1977); *Yumich v. Cotter*, 452 F.2d 59, 64 (7th Cir.1971), *cert. denied*, 410 U.S. 908, 93 S.Ct. 955, 35 L.Ed.2d 269 (1973), as a practical matter, neither side had the ability to actually produce him at trial. For this reason alone, the district court properly denied Rodriguez's proposed missing witness instructions.

Nevertheless, citing *Mahone, supra,* Rodriguez argues that it was still reversible error for the court to deny him the right to comment on the government's failure to call Mario at trial. This case, however, is wholly unlike the factual situation presented in *Mahone.* In *Mahone,* we concluded that "in the in-between case where each side *has the physical capacity to locate and produce the witness* and it is debatable which side might more naturally have been expected to call the witness, there may be latitude for the judge to leave the matter to debate." *Id.* at 927 (quoting *United States v. Young*, 463 F.2d 934, 943 (D.C.Cir.1972)). In this instance, neither side had the physical capacity to produce Mario at the second trial. Consequently, no inference relevant to the trial could be drawn from Mario's absence and the trial court properly precluded argument directed at presenting such an inference to the jury.

## C. The Bench Warrant

Rodriguez next argues that the district court erred in quashing the material witness warrant for Mario's arrest after Rodriguez was convicted at the second trial. He argues that the result of this action was to deny him his Sixth Amendment right to compulsory process. This argument is wholly without merit. By the express terms of the Sixth Amendment, the constitutional guarantee of compulsory process applies only to an *accused* faced with a *pending* criminal prosecution.[3] It does not obtain *after* criminal culpability has been established at a trial where its benefits were enjoyed. Indeed, if we were to hold otherwise, a witness not charged with any crime could suffer significant restrictions

---

3. The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

on his liberty or property, all in the uncertain hope that a reversal would be obtained on appeal. The Constitution does not mandate such a result.

### D. Cross-Examination

Rodriguez's final contention on appeal concerns the district court's decision to allow the government on cross-examination to inquire into the identity of his heroin supplier. In a motion filed *in limine* and later repeated at trial, Rodriguez sought to preclude this line of questions on several grounds. First, he argued that, since he admitted to the sale of heroin, the actual identity of the "source" was irrelevant to the government's case against him and thus inadmissible under Rule 401 of the Federal Rules of Evidence. Alternatively, he asserted what amounted to a duress defense: He alleged, through his attorney, that codefendant Pizarro had "cautioned" him against identifying Pizarro as the heroin supplier. He argued that Rule 403 of the Federal Rules of Evidence dictated the preclusion of questions that would elicit this testimony, because his fear of reprisal constituted a form of prejudice, which, he contended, substantially out-weighed the probative value of the testimony to the government. Finally, translating this latter evidentiary contention into a constitutional argument, Rodriguez maintained that requiring him to identify his heroin supplier denied him a fair trial since the ruling required him to choose between two constitutional rights: his right to testify on his own behalf and his right to be free of bodily harm. Unpersuaded by these contentions, the district court denied the motion, stating that if Rodriguez did indeed refuse to testify, an evidentiary hearing into the purported death threats would be necessary. Rodriguez, however, chose to answer the questions and testified that William Caban-Torres, the tenant of 2155 North Avers, was the source of the heroin sold to Agent Peasant.

■ On appeal, Rodriguez reiterates the claims he made in the district court, pointing out, in addition, that the government

"capitalized" on his "dilemma" by arguing to the jury that his identification of Caban-Torres was "ridiculous" and indicative of the incredibility of his entire testimony. Regardless of the merits of the government's argument, which of course presented questions of fact for the jury, we cannot, on the record before us, conclude that the district court's ruling exceeded its broad discretion over matters pertaining to the relevancy and admissibility of evidence, *Hamling v. United States,* 418 U.S. 87, 124–25, 94 S.Ct. 2887, 2911–12, 41 L.Ed.2d 590 (1974); *United States v. Bernhardt,* 642 F.2d 251, 253 (8th Cir.1981); *United States v. Robinson,* 560 F.2d 507, 514 (2d Cir.1977) (*en banc*), as well as its authority to control the extent and scope of cross-examination. *United States v. Hansen,* 583 F.2d 325, 332 (7th Cir.), *cert. denied,* 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *United States v. Isaacs,* 493 F.2d 1124, 1162 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). First, with respect to Rodriguez's relevancy contention, the government's inquiry into the identity of Rodriguez's heroin supplier was clearly directed at establishing "a fact that [was] of consequence to the determination of the action." Fed.R.Evid. 401. Given Rodriguez's assertion of an entrapment defense, the government had to show beyond a reasonable doubt that he was predisposed to engage in the heroin venture. *United States v. Townsend,* 555 F.2d 152, 155 n. 3 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977). While the identity of the heroin supplier by itself provided little assistance in carrying this burden, taken in conjunction with other evidence, this testimony confirmed that Rodriguez had shifted, on his own initiative, from his original source, "Eddy," to another supplier in order to consummate the transaction. Thus, the identity of the source was relevant evidence tending to show Rodriguez's enthusiasm for the transaction and his knowledge of the local heroin market, all of which bore on the crucial issue of predisposition. *See United States v. Guevara,* 598 F.2d 1094, 1098 (7th Cir.1979). Rule 401 requires no more. *See generally* 1 J. Wein-

stein & M. Berger, Weinstein's Evidence ¶ 401[03] (1982).

Rodriguez's claim of unfair prejudice similarly finds little support in the record. Despite his counsel's assertion that he had been threatened with death, Rodriguez never refused to answer the government's inquiries, nor did he offer any factual support for this contention. Indeed, when his counsel pressed the issue during a break in Rodriguez's direct testimony, the trial judge stated in Rodriguez's presence that an evidentiary hearing into the entire matter would be necessary if Rodriguez chose not to answer the government's questions. Having rejected this opportunity to establish the validity of his contention in the district court, Rodriguez cannot now assert these same allegations on appeal as factual grounds for reversal. Thus, even if we were to accept his argument that death threats constitute a form of prejudice subject to the balancing test of Rule 403, we could not conclude that the district court abused its discretion in rejecting this unsubstantiated claim as grounds for limiting the scope of the government's cross-examination. *Cf. United States v. Patrick,* 542 F.2d 381, 388 (7th Cir.1976) (duress if proven may be a defense to criminal contempt charge arising out of a refusal to testify), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977); *United States v. Cabrera,* 440 F.Supp. 605, 606 (S.D.N.Y.1977) (same), *aff'd mem.,* 578 F.2d 1370 (2d Cir. 1978).

Rodriguez's constitutional argument was also properly rejected. Essentially, that claim rests on the concept commonly referred to as the doctrine of unconstitutional conditions. This doctrine precludes the government from coercing the waiver of a constitutional right either by conditioning the exercise of one fundamental right on the waiver of another, *e.g., Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968), or by attaching conditions which penalize the exercise of a right protected by the Constitution. *E.g., United States v. Jackson,* 390 U.S. 570, 583, 88 S.Ct. 1209, 1217, 20 L.Ed.2d 138 (1968). *See generally* Comment, *Another Look at Unconstitutional Conditions,* 117 U.Pa.L.Rev. 144 (1968). Rodriguez argues that this doctrine was implicated in this instance because his right to testify in his own behalf was conditioned upon his answering questions which might jeopardize his "right to life." While this argument suffers from the same factual deficiencies discussed above, a more fundamental flaw exists: The source of Rodriguez's alleged fears and consequently the condition complained of did not emanate from any governmental authority, nor was it subject to control by the government. Rather Rodriguez's predicament, if it existed, resulted from his own admitted involvement in a criminal enterprise, an involvement which Rodriguez must have known carried with it the dangers from which he now seeks governmental protection. Under the circumstances, it cannot be said that the government sought in any way to coerce a waiver of Rodriguez's constitutional rights. Having elected to place his version of the facts before the jury, he cannot reasonably claim immunity from the truth-seeking process on grounds unrelated to any governmental act. *Piemonte v. United States,* 367 U.S. 556, 559 n. 2, 81 S.Ct. 1720, 1722 n. 2, 6 L.Ed.2d 1028 (1961).

## III.  PIZARRO'S APPEAL

The principal and dispositive contention raised by Pizarro on appeal concerns the district court's decision at his third trial to exclude as hearsay Rodriguez's testimony at the second trial which identified Caban-Torres rather than Pizarro as the source of the heroin. Pizarro's contention before this court as well as before the district court was that Rodriguez's refusal to testify at the third trial, which the government concedes rendered him unavailable under Fed. R.Evid. 804(a)(1), formed the predicate for the admission of his former testimony pursuant to Fed.R.Evid. 804(b)(1). The district court in rejecting this argument concluded that the government had been unable to fully develop Rodriguez's identification testimony at the second trial and thus Rodri-

guez's exculpatory statements did not qualify for admission under the former testimony exception to the hearsay rule. Fed.R. Evid. 804(b)(1). Because we cannot agree that the record supports this conclusion, and because this former testimony, if admitted, could have affected the decision of the jury, we are compelled to reverse.

■ As the district court correctly observed, the former testimony of a now unavailable declarant may only be admitted "if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect testimony." Fed.R. Evid. 804(b)(1). This requirement operates to screen out those statements, which although made under oath, were not subject to the scrutiny of a party interested in thoroughly testing its validity. In requiring only an opportunity and motivation, however, the rule also incorporates a concept of fairness. J. Weinstein & M. Berger, *supra,* ¶ 804(b)(1)[02], at 804–58. As the advisory committee notes to Rule 804 observe: "If the party against whom [the testimony is] now offered is the one *against* whom the testimony was offered previously, no unfairness is apparent in requiring him to accept his own prior conduct of cross-examination or decision not to cross-examine." Consequently, our inquiry under this exception focuses not on the extent of cross-examination at the former proceeding, but on whether the party's handling of the testimony was " 'meaningful in light of the circumstances which prevail[ed] when the former testimony [was] offered.' " *Id.* (quoting McCormick, Evidence § 255, at 616 (2d ed. 1972)).

■ Applying this test to the instant case, it is apparent that the government had the motivation to demonstrate that Rodriguez was not telling the truth when he identified Caban-Torres as the heroin supplier. This testimony was not only highly damaging to their case against Pizarro, but also went directly to the issue of Rodriguez's credibility, which the government itself contends was the ultimate issue in that case. Indeed, as noted above, the government cited this testimony during its closing argument as evidence of Rodriguez's untrustworthiness. Consequently, it was in the government's best interests to fully explore the identification issue, and thus the opportunity to cross-examine Rodriguez on this point was both meaningful and real.

■ The government nonetheless contends that the district court properly denied admission of the identification testimony on the grounds that the prosecution was unable to inquire into the death threat issue, and was thus precluded from effectively attacking the validity of this statement. In support of this contention, however, the government cites no written or recorded oral ruling by the court actually precluding the government from inquiring into this issue, nor have we been able to discover any express limitation in the record. To the contrary, the record reveals that, on *Rodriguez's* insistence and over Pizarro's objections, the court refused to limit any party's inquiry into this area, choosing instead to see "the whole thing played out." The sole reference in the record pertaining to the government's ability to cross-examine Rodriguez consists of a remark by the prosecutor to Pizarro's counsel informing him that the government had no intention of asking any questions concerning the death threats. Apparently, the government thought such a concession would dampen the defense objections to its inquiry into the identity of the heroin supplier and preclude a motion for a severance which Pizarro had been threatening. Such a self-imposed restriction, however, does not constitute an actual preclusion of the issue; at best it represented the government's selection of a trial strategy unrelated to any factor relevant to its substantive position in the case. *See, e.g., United States v. Zurosky,* 614 F.2d 779, 793 (1st Cir.1979), *cert. denied,* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *United States v. Richman,* 600 F.2d 286, 299 (1st Cir.1979). Assuming, after Rodriguez identified Caban-Torres, that the government truly desired to engage in an exploration of the death threats, under the court's rulings it was certainly free to do so. If such an

inquiry resulted in a severance for Pizarro, then, of course, this would have been his right, the preclusion of which the government cannot now argue obviated its opportunity to cross-examine *Rodriguez* fully and fairly.[4] Certainly, the rights of a defendant cannot be made to depend upon the government's desire for efficiency in a multi-defendant prosecution.

■ In any event, the government's ability to attack the veracity of Rodriguez's identification testimony on cross-examination was not limited to an exploration of his motivation to lie. Throughout its 45-minute cross-examination, the government meticulously attacked Rodriguez's testimony by comparing his version of the drug transaction to the tape-recorded negotiations between Rodriguez and Agent Peasant. As the government points out, these recordings, when coupled with testimony supplied by DEA surveillance agents, effectively attacked Rodriguez's claim that Caban-Torres rather than Pizarro delivered the heroin to 2155 North Avers Street. Of course, the merits of either version was a question for the jury; but under these circumstances it cannot be said that the government did not have a full and fair opportunity to test the validity of Rodriguez's testimony. And given the government's ability to present Rodriguez's hearsay statements against Pizarro through its tape recordings both at the second as well as the third trial, Pizarro was surely entitled to present Rodriguez's subsequent exculpatory trial testimony to the jury for its evaluation. Both sides were then free at the third trial to present whatever corroborative or impeachment evidence they possessed to shore up their respective positions on Rodriguez's veracity at the second trial, including any evidence of death threats which the trial court determined were admissible. *See* Fed.R.Evid. 806.

■ The government's other arguments on this score are similarly without merit. The government first argues that Rodri-

guez's testimony was "inherently unreliable" and "wholly uncorroborated" and hence the district court properly denied its admission at the third trial. Secondly, it contends that since the jury rejected Rodriguez's entrapment defense at the second trial, the jury necessarily disbelieved Rodriguez's identification testimony. Both arguments suffer from the same flaw: Both seek to have the admissibility of previously cross-examined trial testimony turn on a subsequent court's view of the unavailable declarant's reliability. No such limitation was imposed by Congress under the former testimony exception, and we decline the invitation to engraft such a reliability requirement. As the Supreme Court has stated in rejecting a similar argument under the confrontation clause, but in language equally applicable here: " 'Since there was an adequate opportunity to cross-examine [the witness], and counsel ... availed himself of that opportunity, the transcript ... bore sufficient 'indicia of reliability' and afforded 'the trier of fact a satisfactory basis for evaluating the truth of the prior statement.' " *Ohio v. Roberts,* 448 U.S. 56, 73, 100 S.Ct. 2531, 2542, 65 L.Ed.2d 597 (1980) (quoting *Mancusi v. Stubbs,* 408 U.S. 204, 216, 92 S.Ct. 2308, 2314, 33 L.Ed.2d 293 (1972)). *See also United States ex rel. Haywood v. Wolff,* 658 F.2d 455, 459–62 (7th Cir.), *cert. denied,* 454 U.S. 1088, 102 S.Ct. 649, 70 L.Ed.2d 625 (1981).

■ Finally, the government argues that the former testimony was excludable under Rule 804(a)(1) because the death threats had contributed to Rodriguez's unavailability. The record, however, fails to provide factual support for the government's construction of the events in the district court. At the conference held to discuss Rodriguez's desire not to testify at the third trial, the court placed Rodriguez's attorney on the stand and questioned him concerning Rodriguez's unavailability. He testified that Rodriguez's refusal to answer

---

4. We express no opinion as to whether a severance would have been required if the death

threats had been introduced.

Pizarro's subpoena was based on two grounds:

"The Witness: [Rodriguez] is asserting his Fifth Amendment right now based on the fact it is prior to sentencing and with the possibility of a perjury prosecution which your Honor just indicated if you found at the time of sentencing he wilfully perjured himself, you would recommend to [the United States Attorney] that he prosecute him. On that basis he is exercising his Fifth Amendment right.

The Court: Then he is not unavailable because of the threat; he is unavailable because he really wants to exercise his Fifth Amendment.

The Witness: Well, he is also unavailable because of the threat because he wishes to exercise his Fifth Amendment due process right to life which is what the motion was all about."

The court, however, never ruled on the question of which reason actually excused Rodriguez's appearance. Nor did the court order Rodriguez to appear and substantiate either claim, although Pizarro repeatedly requested an opportunity to test both the death threat allegation and the claim of privilege. Further, the court declined Pizarro's demand that he be allowed to take the stand and deny Rodriguez's accusation under oath. On this record, we can only conclude that the court's decision to excuse Rodriguez's absence was based solely on its belief that regardless of the validity of the death threats, Rodriguez would assert his privilege against self-incrimination. Certainly, the hearing was wholly insufficient to establish that, absent a Fifth Amendment privilege, Rodriguez would persist in his refusal to testify *because* he feared reprisals from the very man who had subpoenaed his presence, *see* Fed.R.Evid. 804(a)(2); *cf. United States v. Boulahanis,* 677 F.2d 586, 588 (7th Cir.1982), and we decline to construe the district court ruling to hold otherwise.

█ Having concluded that Rodriguez's former testimony was erroneously excluded, we must address the question whether this ruling requires a new trial. In making this determination we are guided by the Supreme Court's statement in *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." While this right is not absolute, *United States v. Valenzuela-Bernal, supra,* 102 S.Ct. at 3449, where a court erroneously excludes "testimony [that] would have been relevant and material, and . . . vital to the defense," *Washington v. Texas,* 388 U.S. 14, 17, 87 S.Ct. 1920, 1922, 18 L.Ed.2d 1019 (1967), thus rendering the defendant's case "far less persuasive than it might have been," *Chambers v. Mississippi, supra,* 410 U.S. at 294, 93 S.Ct. at 1045, then a new trial must be provided. *United States v. Benveniste,* 564 F.2d 335, 342 (9th Cir.1977).

In this instance, the exclusion of Rodriguez's former testimony clearly deprived Pizarro of vital exculpatory evidence in a case that rested entirely on circumstantial evidence, the majority of which consisted of other out-of-court statements made by Rodriguez. By depriving Pizarro of Rodriguez's testimony under oath exonerating him from any involvement in the drug transaction, Pizarro's ability to defend against the government's charge was severely crippled. While the government did show that Pizarro's movements coincided with those ascribed to the heroin supplier by Rodriguez in his taped phone conversations with Agent Peasant, this was not a case where the government's proof led inexorably to a finding of guilt on the part of Pizarro: The evidence also corroborated Rodriguez's identification of Caban-Torres as his heroin supplier.

Caban-Torres not only rented and occupied the apartment where the drug transaction allegedly occurred, but he was the individual discovered attempting to dispose of heroin shortly after the drug sale. Heroin and drug paraphernalia apparently belonging to Caban-Torres were also discovered in the apartment. Pizarro, on the other hand, had no drugs or money in his possession when he was arrested. Furthermore, Rodriguez's testimony at the second trial that

Caban-Torres was a longtime, trusted "compadre" also meshed with his tape-recorded description of the heroin supplier. Indeed, Rodriguez was arrested driving Caban-Torres's automobile. Finally, neither Rodriguez's telephonic account of the heroin sale, nor the testimony supplied by the DEA surveillance agents was so reliable as to preclude the jury from believing that Caban-Torres was the heroin supplier. Rodriguez admitted on cross-examination that he did not always tell Agent Peasant the truth about details of the heroin transaction, thereby adding an element of uncertainty to his tape-recorded version of the events.

Furthermore, although the DEA surveillance agents testified that they saw no one enter 2155 North Avers other than Pizarro during the relevant time period, none of them testified that the surveillance was "air tight"; or that it was impossible for Caban-Torres to have obtained the heroin from another location within the apartment building; or even that it was impossible for Caban-Torres to have left the building. Under these circumstances, the exclusion of Rodriguez's testimony that Pizarro was not the source cannot be considered "harmless error." Certainly it cannot be said with any assurance that had such testimony been placed before the jury at Pizarro's third trial, the jury's verdict would have been the same. Accordingly, we conclude that a new trial must be provided Pizarro so that his guilt or innocence may be fairly decided.

Affirmed as to appellant Rodriguez.

Reversed and remanded for a new trial as to appellant Pizarro.